**GRUMMAN AEROSPACE CORPORATION**

v.

**The UNITED STATES.**

**No. 544–76.**

United States Court of Claims.

June 14, 1978.

Gene Perry Bond, Washington, D. C., attorney of record, for plaintiff. Robert P. Murphy, Chapman, Duff & Paul, Washington, D. C., Raphael Mur and Robert W. Ballin, Bethpage, N. Y., of counsel.

Thomas W. Petersen, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant.

1. The parties have stipulated that the decision on the contract now before us (NAS5–814) would determine the cost allowability of these fees in other contracts with NASA and the Department of the Navy which were the subject of separate appeals to the NASA BCA and the Armed Services Board of Contract Appeals (ASBCA).

2. The first NASA BCA decision denied reimbursement of some of these expenses; the second Board decision denied plaintiff's motion to reopen the hearing in order to permit it to introduce additional evidence which it alleged would alter the previous Board decision denying reimbursement.

3. The *Allowable Cost, Fixed Fee and Payment* clause provided in pertinent part:

"ALLOWABLE COST, FIXED FEE AND PAYMENT (July 1970)

(a) For the performance of this contract, the Government shall pay to the Contractor:

(i) the cost thereof (hereinafter referred to as 'allowable cost') *determined by the Contracting Officer* to be allowable in accordance with—

Before COWEN, Senior Judge, and DAVIS, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges, en banc.

## ON PLAINTIFF'S AND DEFENDANT'S CROSS–MOTIONS FOR SUMMARY JUDGMENT

DAVIS, Judge:

Grumman Aerospace Corp. seeks review under the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1970), of two decisions of the National Aeronautical Space Administration Board of Contract Appeals (NASA BCA) on the company's right to reimbursement, under cost-plus-fixed-fee contracts with NASA and the Department of the Navy,[1] with respect to certain legal and accounting fees for outside services incurred by plaintiff during 1970, 1971 and 1972 in connection with renegotiation proceedings for its 1964 and 1965 fiscal years.[2]

I

On November 30, 1960, Grumman was issued a letter contract by NASA for the design and development of an Orbiting Astronomical Observatory satellite and related ground equipment. The formalized contract included the standard clauses prescribed by NASA Procurement Regulations for use in cost-reimbursement research and development contracts.[3] Those clauses pro-

(A) Part 15, Subpart 2 of the NASA Procurement Regulation as in effect on the date of this contract; and

(B) the terms of this contract; and

(ii) such fixed fee, if any, as may be provided for in the Schedule.

\* \* \* \* \* \*

"(d) At any time or times prior to final payment under this contract the Contracting Officer may have the invoices or vouchers and statements of cost audited. Each payment theretofore made shall be subject to reduction for amounts included in the related invoice or voucher *which are found by the Contracting Officer, on the basis of such audit, not to constitute allowable cost.* Any payment may be reduced for overpayments, or increased for underpayments, on preceding invoices or vouchers."

Article XX of the contract provided:
"ARTICLE XX—*FINAL AUDIT*

"This contract shall be subject to a final audit of costs by a Government Agency prior to approval of a final or completion voucher.

vided that Part II, Section XV of the Armed Services Procurement Regulations (ASPR) would control the allowability of costs under the contract.[4] The allowability of legal and accounting fees was thus governed by ASPR section 15–205.31, which provided for the reimbursement of such fees except when (inter alia) incurred in "the prosecution of claims against the Government."[5] This case concerns that exclusionary provision.

Grumman's proceedings before the Renegotiation Board were typical of the process faced by contractors prior to redetermination proceedings in this court (or the Tax Court).[6] On October 27, 1967, the Eastern Regional Board, after reviewing Grumman's filings to the Board for its 1965 fiscal year, made its recommendation that Grumman had earned excessive profits. After receiving the Regional Board's summary of facts and reasons for its decision, Grumman refused to enter into an excess profits refund agreement on the basis of these findings and pursued its right to de novo review before the statutory Renegotiation Board. Proceedings at that level ultimately resulted in the Board's initial determination, on April 15, 1968, that plaintiff had earned excessive profits in 1965. On May 1, 1968,

the Board confirmed its initial decision while denying plaintiff's request for certain information bearing upon the reasons for this decision. When negotiations for a refund agreement based upon this determination had reached an impasse, the Board, on May 21, 1968, issued its unilateral order determining its position as to the existence and amount of excessive profits for 1965. Its statement of facts and reasons was subsequently provided to plaintiff (at its request) on July 26, 1968. In early August, Grumman filed its petition for de novo review of the Board's order in the Tax Court; the case was transferred to the Court of Claims in July 1971, pursuant to the extension of the Renegotiation Act of 1951, Pub. L.No.92–41, § 3, 85 Stat. 97 (1971), and was referred to a trial judge of this court in August 1971. During and subsequent to this time, Grumman and the Justice Department were working on proposed stipulations for use in the judicial redetermination proceeding and were also negotiating the terms and conditions of a compromise settlement for both the 1965 and 1966 renegotiable years.

Renegotiation of Grumman's earnings in 1966 had a slightly different history. Fol-

"It is understood and agreed that Part II, Section 15 of ASPR shall prevail with respect to allowability of cost hereunder. The Contractor shall be reimbursed at billing rates acceptable to the Contracting Officer or his authorized representative, subject to appropriate adjustment when the final rates for that period are established."

4. For the purposes of this case, the 1960 Edition of ASPR Section XV contained essentially the same provisions as the present Section XV of both ASPR and NASA PR. In conformity with the Board's opinion and the parties' briefs before us, we will refer to and cite only the current ASPR provisions.

5. Section 15–205.31, 32 C.F.R. § XV, Part II (1976), provides in pertinent part:
"15–205.31 Professional and Consultant Service Costs—Legal, Accounting, Engineering, and Other.
"(a) Costs of professional and consultant services rendered by persons who are members of a particular profession or possess a special skill and who are not officers or employees of the contractor are allowable, subject to (b), (c),

and (d) below when reasonable in relation to the services rendered and when not contingent upon recovery of the costs from the Government (but see 15–205.26).

\* \* \* \* \* \*

"(d) Costs of legal, accounting, and consulting services, and related costs, incurred in connection with organization and reorganization, defense of anti-trust suits, and the prosecution of claims against the Government, are unallowable. Costs of legal, accounting, and consulting services, and related costs, incurred in connection with patent infringement litigation, are unallowable unless otherwise provided for in the contract. (Also see 15–205.23.)"

6. For a detailed description of the Renegotiation Board's procedures, see Renegotiation Board v. Grumman Aircraft Eng'r Corp., 421 U.S. 168, 170–79, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975); Bannercraft Clothing Co. v. Renegotiation Board, 151 U.S.App.D.C. 174, 178–79, 466 F.2d 345, 349–50 (1972), rev'd, 415 U.S. 1, 94 S.Ct. 1028, 39 L.Ed.2d 123 (1974).

lowing Grumman's refusal to accept the Regional Board's August 15, 1967 final recommendation that it had earned excessive profits in 1966, the statutory Board confirmed, on December 16, 1970, the Regional Board's decision as to the existence of excessive profits. Plaintiff was granted repeated extensions of time to indicate whether it would enter into a refund agreement on the basis of that decision. However, a unilateral order for 1966 was never issued because Grumman's December 15, 1972 offer of full settlement for 1965 and 1966 was accepted by the Government in February 1973.

During its proceedings before the Renegotiation Board and pending its *de novo* appeal to the court, Grumman was also involved in a suit under the Freedom of Information Act (FOIA), 5 U.S.C. § 552 (1970) (amended 1976), to force disclosure to it of two kinds of information used by the Board in determining the excessiveness of its profits for 1965 and 1966. The first request, made to the Board in April 1968 (after the Board's initial determination of the excessiveness of the profits earned in 1965, but prior to the issuance of its unilateral order), sought disclosure of "the final opinions, determinations, unilateral orders, agreements, clearance notices and letters not to proceed, as well as the written summaries of facts and reasons upon which such were based, issued in the adjudication of renegotiation cases from 1962–65 involv-

ing fourteen of its competitors." Grumman's request was made "as further assistance in enabling us to determine whether to enter into an agreement with the Board." On May 21, 1968, the date of the Board's unilateral order for 1965, the Board upheld its General Counsel's denial of this request on the basis that the records requested were subject to exemptions under the FOIA set forth in subsections (b)(3) and (b)(4),[7] and under Board Regulations 1480.9(a)(3)–(4), 1480.9(b).[8] Before receiving notice of this decision, plaintiff made its second request to the Board to make available, in addition, all reports, correspondence and data contained in the Board's files regarding its own performance on its renegotiable contracts in 1965. The Board denied this request on May 21 and June 13, 1968, citing the same statutes and regulations and also claiming that the request lacked the necessary specificity to be honored.

On June 27, 1968, Grumman filed suit in the District Court for the District of Columbia under 5 U.S.C. § 552(a)(3) (1970) (amended 1974) seeking to enjoin the Board from withholding, and ordering the production of, the records relating to its competitors' renegotiation cases and the documents concerning its own case. The District Court granted the Government's motion for summary judgment without opinion. On appeal, the Court of Appeals held that plaintiff was entitled to access to the records and documents after suitable deletions

---

7. 5 U.S.C. § 552(b)(3)–(4) (1970) (amended 1976) provides:

   "This section does not apply to matters that are—

   \* \* \* \* \* \*

   "(3) specifically exempt from disclosure by statute;

   "(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;"

8. Regulation 1480.9(a)(3)–(4), 32 C.F.R. § 1480.9(a)(3)–(4) (1977) provides:

   "(a) *In general.* The provisions of [5 U.S.C. § 552] do not apply to the following:

   \* \* \* \* \* \*

   "(3) Matters specifically exempted from disclosure by statute \* \* \* \*

   "(4) Trade secrets and commercial, financial or other information that is privileged or that

was given to the Board in confidence or would not customarily be made public by the person from whom it was obtained."

   Regulation 1480.9(b), 32 C.F.R. § 1480.9(b) (1968) (revoked 1971) provides:

   "(b) *Certain records.* Without limiting the generality of the provisions of paragraph (a) \* \* \* the following are exempt:

   "(1) Financial statements filed with the Board pursuant to § 1470.3(a) and (b) of this subchapter.

   "(2) Reports from any Department, or from any contractor, providing information to the Board for renegotiation purposes with respect to the performance of any contract or subcontract.

   "(3) Determinations, unilateral orders, agreements, clearance notices and letters not to proceed \* \* \* \*"

by the Board of confidential commercial or financial information, as required by exemption (b)(4) of the Freedom of Information Act, *see* note 7, *supra*. *Grumman Aircraft Eng'r Corp. v. Renegotiation Board*, 138 U.S.App.D.C. 147, 425 F.2d 578 (1970). On remand, the District Court held that summaries of facts and reasons, and certain other reports and documents, constituted "final orders and opinions" and had to be made available to plaintiff. *Grumman Aircraft Eng'r Corp. v. Renegotiation Board*, 325 F.Supp. 1146 (D.D.C.1971). The Court of Appeals affirmed the District Court, *Grumman Aircraft Eng'r Corp. v. Renegotiation Board*, 157 U.S.App.D.C. 121, 482 F.2d 710 (1973), but the Supreme Court reversed, holding that the documents sought were not subject to disclosure under the FOIA but were pre-decisional consultative memoranda exempted from disclosure by Exemption 5 of that Act. *Renegotiation Board v. Grumman Aircraft Eng'r Corp.*, 421 U.S. 168, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975).

Legal and accounting fees incurred in the renegotiation proceedings and in the FOIA suit were at stake in the NASA BCA decision we are asked to review. Plaintiff did not seek reimbursement of those fees as such, but only as part of the general and administrative expenses allocated to the particular contract (No. NAS5–814). Grumman's expenses for these outside legal and accounting fees can be separated into three categories: (1) costs incurred in proceedings before the Renegotiation Board; (2) costs of appealing the Board's unilateral order for 1965, including the costs of settlement negotiations pending such judicial redetermination, and (3) the expenses of suing to compel disclosure, under the Freedom of Information Act, of information used by the Renegotiation Board in making its decision. Plaintiff, however, did not so distinguish its legal and accounting fees incurred during 1970, 1971, and 1972, but instead recorded and charged them as a general and administrative expense, thereby allocating them among all of its contracts on a total cost input basis.[9] During the summer of 1972, the Defense Contract Audit Agency (DCAA)[10] resident auditor challenged this treatment of legal and accounting expenses during a routine review of Grumman's overhead accounts for 1970 and 1971. Acting upon the DCAA recommendation, the Contracting Officer issued, in May 1973, a Notice of Contract Costs Suspended and/or Disapproved, with supporting documents, which totally disallowed these fees for 1970, 1971 and 1972.[11] Following expiration of sixty days, the notice matured into the final decision of the Contracting Officer, which Grumman timely appealed to the NASA Board of Contract Appeals.

Before the NASA Board, the Government conceded the allowability of those legal and accounting fees incurred before the Renegotiation Board on the theory that expenses, such as these, incurred in connection with the preparation of reports designed to help settle an issue before or during the formulation of the final Government position (unilateral order) were allowable, while subsequent expenses incurred in an adversarial relationship to that position were disallowed as "claims against the Government." Following the defendant's concession, the NASA Board granted Grumman's expenses of pursuing renegotiation before the Renegotiation Board's unilateral order of May 21, 1968 (for the 1965 year) and "with regard to its 1966 renegotiation case wherein at the instance of [plaintiff] a uni-

---

**9.** No issue is now raised as to allocation of the fees (if reimbursable) or as to their reasonableness. Although 85% of Grumman's contracts at this time were renegotiable, we do not know what portion of such contracts were of the cost-reimbursement type and thus what portion of such expense is actually sought to be recovered in this suit.

**10.** The DCAA is the agency of the Department of Defense authorized to audit contractors' rec-

ords and recommend to cognizant contracting officers the extent to which payments should issue against vouchers and invoices submitted by contractors.

**11.** As part of a compromise agreement covering its 1969 renegotiable year, Grumman had previously concurred in a similar disallowance of these fees for that year.

lateral order was never issued, prior to the [Renegotiation] Board's determination of excess profits dated December 16, 1970." The NASA Board disallowed all the other legal and accounting expenses which were claimed.

In this court, the Government does not challenge the NASA Board's decision insofar as it awarded reimbursement to Grumman. That portion of the administrative determination has not been put before us and even if we could we have no occasion to probe into it for ourselves. We shall be concerned only with the portion of Grumman's demand which the NASA BCA rejected. In doing so, we shall treat separately with the disallowed expenses in the renegotiation proceedings themselves and then with those involved in the FOIA suit.

## II

As for the renegotiation proceeding itself, Grumman does not deny that "prosecution of claims against the Government"—the ASPR phrase *see* note 5, *supra,* we have to construe—includes (at the least) adversary monetary demands on the Government for sums the claimant alleges are owing. *See* Part III, *infra.*[12] Plaintiff's position is, rather, that (1) the entire process of renegotiation involves continuous negotiation and bargaining, not the prosecution at any stage of a "claim" at all, *i. e.,* of a formal adversary demand by one party against another, and (2) if perchance a "claim" is thought to be involved, then the "claim" is *by* the Government, not against it.

A. Relying heavily upon certain language in *Renegotiation Board v. Bannercraft Clothing Co.,* 415 U.S. 1, 94 S.Ct. 1028, 39 L.Ed.2d 123 (1974), plaintiff asserts that renegotiation consists of a series of stages of bargaining and consultation as to the appropriate level of profits—with each stage free to make new findings. When the proceedings leave the Renegotiation Board because the contractor and the Board cannot agree, the transfer to this court is

alleged to be no more significant than the transfer between prior levels of negotiation under the Board—that is, the whole continuum from the first step in the administrative board through resolution in this court is merely a series of stages in a single process of negotiation. Issuance of a unilateral order does not, it is said, transform the nature of the proceeding into the prosecution of a claim by the contractor against the Government; rather it constitutes another factor in the contractor's calculus in deciding whether to reach an agreement with the Government.

■ We do not, however, see renegotiation as a unique or distinctive process for the purposes of cost allowability; the similarities of proceedings before the Renegotiation Board and before a contracting officer in "under the contract" disputes make relevant the analogy to contract-appeals litigation (administrative and judicial)—the cost of which would not be reimbursable under the ASPR clause. The informal negotiation which characterizes proceedings before the Renegotiation Board also accurately portrays the process occurring between a contractor and the contracting officer when attempts are first made to resolve "under the contract" disputes. Similarly, in each type of proceeding, the reaching of an agreement (between the contractor and the Renegotiation Board, or between the contractor and the contracting officer) finally resolves the dispute. Moreover, failure to reach an agreement initiates a similar process in each type of proceeding; under the Renegotiation Act, if negotiations reach an impasse, the statutory board issues a unilateral order which becomes final and conclusive if not contested within 90 days, 50 U.S.C. App. § 1215 (1970 & Supp. V 1975), while decisions of the contracting officer concerning a dispute are also final unless appealed to a board of contract appeals within 30 days of receipt, Standard Disputes Clause, Standard Form 23-A (October 1969). When the unilateral order or a

---

12. In this connection, plaintiff does not dispute the contract rule, accepted by the NASA Board, that normally when a dispute "under the con-

tract" goes on appeal to a board of contract appeals or into court litigation it becomes a "claim" which is being "prosecuted."

contracting officer's final decision is appealed, the contractor receives a *de novo* determination in the Court of Claims or before a board of contract appeals. 50 U.S.C. App. § 1218 (1970 & Supp. V 1975); *Southwest Welding & Mfg. Co. v. United States*, 413 F.2d 1167, 1184–85, 188 Ct.Cl. 925, 954 (1969). In both classes of case, this *de novo* proceeding is the first in which the contractor is afforded due process. *Lichter v. United States*, 334 U.S. 742, 791–92, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948); *Sandnes' Sons, Inc. v. United States*, 462 F.2d 1388, 1391–92, 199 Ct.Cl. 107, 112–13 (1972); *L. Rosenman Corp. v. United States*, 390 F.2d 711, 712 n. 2, 182 Ct.Cl. 586, 588 n. 2 (1968). Even burdens of persuasion may be identical in both types of proceedings: in renegotiation cases, the plaintiff of course has the burden of proof as to disputed accounting data; however, with regard to the existence and amount of excessive profits the Government has the burden of persuasion after the contractor has met its burden of going forward, *Lykes Bros. S.S. Co. v. United States*, 459 F.2d 1393, 198 Ct.Cl. 312 (1972); *Camel Mfg. Co. v. United States*, (1978), 572 F.2d 280, 215 Ct.Cl. ––––; in certain types of cases "under the contract," the Government must also bear the ultimate burden of persuasion, *Lykes Bros. S.S. Co. v. United States*, 459 F.2d at 1403, 198 Ct.Cl. at 329, *citing Eastern Tool & Mfg. Co.*, ASBCA No. 4815, 58–2 BCA ¶ 1947 (excess costs of reprocurement).

■ The sum of it is that, for present purposes, renegotiation does not differ significantly from contract disputes, and therefore that plaintiff, which accepts the application of the ASPR clause to professional fees incurred in the course of an appeal to a board of contract appeals or in a court suit to review such a board decision (*see, e. g., Reed & Prince Mfg. Co.*, ASBCA No. 3172, 59–1 BCA ¶ 2172 (1959), note 18, *infra*), cannot complain that it is improper to reimburse professional expenses at one stage of a continuous process while denying reimbursement at a later step; it is common to disallow such costs incurred in appealing a contracting officer's final decision as constituting the prosecution of a claim against the Government, *see* 3 J. McBride and I. Wachtel, Government Contracts, § 24.240[10] (1974), even though the appeal is also part of a continuous process undertaken by the claimant.

Certainly, a renegotiation suit in this court differs so drastically from a proceeding before the Renegotiation Board—in the formal nature and due process of the proceedings here, the availability of discovery, the existence of other procedural and substantive legal rights—that the carrying on of renegotiation litigation in this court can properly be described as "prosecution of a claim" even if the parallel characterization for Renegotiation Board proceedings would be negotiation and bargaining.[13]

**13.** Recognition of this difference has been implicit in Supreme Court discussions of the renegotiation process where our role has been described as the "post administrative *de novo* proceeding" and "the judicial remedy at law provided by the Renegotiation Act", and where the Court has noted, "There is no limitation or denial of the contractor's normal litigation rights when the renegotiation process is at an end. The contractor may institute its *de novo* proceeding in the Court of Claims, unfettered by any prejudice from the agency proceeding * * *." *Renegotiation Board v. Bannercraft Clothing Co.*, 415 U.S. 1, 21, 23, 94 S.Ct. 1028, 1040, 39 L.Ed.2d 123 (1974).

Grumman would have us view the repeated judicial reluctance to interfere with the renegotiation process (*Renegotiation Board v. Bannercraft Clothing Co.*, 415 U.S. 1, 94 S.Ct. 1028, 39 L.Ed.2d 123 (1974); *Aircraft & Diesel Equip. Corp. v. Hirsch*, 331 U.S. 752, 67 S.Ct. 1493, 91

L.Ed. 1796 (1947); *Lichter v. United States*, 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948); *Macauley v. Waterman S.S. Corp.*, 327 U.S. 540, 66 S.Ct. 712, 90 L.Ed. 839 (1946)) as proof that our renegotiation proceedings are an integral part of a unified administrative process and that this unity establishes the integral nature of the relationship between the Renegotiation Board and proceedings in our court. We need not decide whether an Article III court, such as ours, can ever be considered part of an administrative process, *see, Renegotiation Board v. Bannercraft Clothing Co.*, 415 U.S. at 21, 23, 27, 94 S.Ct. 1028; *Bannercraft Clothing Co. v. Renegotiation Board*, 151 U.S.App.D.C. 174, 179, 466 F.2d 345, 350 (1972), *rev'd on other grounds*, 415 U.S. 1, 94 S.Ct. 1028, 39 L.Ed.2d 123 (1974), for even if our role in renegotiation were viewed as part of a unified administrative process, this would not preclude (as the analogy to appeals board proceedings

B. Another of Grumman's contentions, with respect to the professional fees incurred in connection with the process of renegotiation itself, is that in renegotiation, especially when suit is brought in this court, it is the Government that is making a claim against the contractor by asserting that the latter owes money to the Government.[14] In a decision in which we placed the burden of persuasion upon the Government in renegotiation cases, *Lykes Bros. S.S. Co. v. United States*, 459 F.2d 1393, 198 Ct.Cl. 312 (1972), we noted that in renegotiation the Government asserts that the contractor owes it money, *id.* 459 F.2d at 1400, 198 Ct.Cl. at 325.[15] From this language in *Lykes Bros.*, and from the wording "prosecution of claims *against* the Government" (emphasis added), Grumman argues that the exclusionary clause in ASPR 15–205.31(d) does not come into play.

This *Lykes Bros.* statement is not dispositive because the opinion makes clear that it was deciding an issue wholly different from the one now before us. In *Lykes Bros.*, the court drew support for its decision that the Government should bear the burden of persuasion by observing that "perhaps the best analogy involves those cases before the boards of contract appeals in which a contractor appeals from a contracting officer's assessment of extra costs," 459 F.2d at 1402–03, 198 Ct.Cl. at 329. "Here, as in those cases," the court continued, "the Government claims that the contractor owes it money." 459 F.2d at 1403, 198 Ct.Cl. at 330. The court's purpose in drawing the analogy was to note that, in that type of contract case, the Government also had the burden of proof in the *de novo* hearing before the appeals board. Yet at the time *Lykes Bros.* was decided, a longstanding board of contract appeals case, interpreting ASPR 15–205.31(d) and identical language in a related ASPR, had indicated that a contractor appealing an excess cost determination was prosecuting a claim against the Government for cost-allowability purposes, *Reed & Prince Mfg. Co.*,

indicates) the division of part of that process for purposes of reimbursing attorney and accounting fees. Where this argument is fundamentally defective, however, is in its assumption that requiring a process to be completed prior to judicial intervention on certain questions (whether this be viewed as a question of primary jurisdiction or of exhaustion of remedies, *see United States v. Western Pac. R.R.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956)) necessarily passes upon the essential nature and interrelationship of the various steps of that process so that it is impossible to hold one part of the process to constitute the prosecution of a claim while another part is permissible bargaining. The doctrines of primary jurisdiction and of exhaustion are only remotely concerned with the qualitative interrelationship of the various parts of the process; the principal reason for the former is the recognition of the need for orderly and sensible coordination of the work of agencies and of courts, while the latter is primarily concerned with the timing of review. 3 K. Davis, Administrative Law Treatise, §§ 19.01, 20.01 (1958). Indeed, one of plaintiff's principal authorities recognized the qualitative difference that occurs when renegotiation proceedings reach this court when it stated, "the Board was created in large part to bring under a single aegis the last stage of informal renegotiation before the Tax Court action." *Aircraft & Diesel Equip. Corp. v. Hirsch*, 331 U.S. at 768, 67 S.Ct. at 1501.

14. As a corollary to its argument that the Government is making a claim against the contractor in renegotiation, plaintiff also makes a vague reference to cost allowability of professional fees when necessarily incurred by reason of some act or demand of the Government. The cases cited, *The Remler Co.*, ASBCA No. 5354, 59–1 BCA ¶ 2264 (1959), *Lake Union Drydock Co.*, ASBCA No. 3073, 59–1 BCA ¶ 2229 (1959), permitted recovery primarily because the contractor equitably deserved reimbursement due to unreasonable refusals and demands by the Government. These equitable considerations are not applicable to the Government's good faith assertion that the contractor had earned excessive profits.

15. That decision there states:
"In fact, a renegotiation case is unlike any other case filed in this court, because the plaintiff here [the contractor] is not seeking to recover a money judgment against the United States. It is the Government, based upon a unilateral order of the Renegotiation Board, which asserts that the contractor owes it money. If the contractor wholly prevails, the court will enter a declaratory judgment that no excessive profits were realized during the year involved."
Also, *see Lykes Bros. S.S. Co. v. United States*, 459 F.2d at 1402, 198 Ct.Cl. at 328; *Aero Spacelines, Inc. v. United States*, 530 F.2d 324, 332, 208 Ct.Cl. 704, 715 (1976).

ASBCA No. 3172, 59–1 BCA ¶ 2172 (1959) see note 18, *infra* ; and this was so notwithstanding that the burden of proof was on the Government, *Eastern Tool & Mfg. Co.*, ASBCA No. 4815, 58–2 BCA ¶ 1947 (1958), and notwithstanding the Government's assertion in that type of case that the contractor owed it money, *Lykes Bros. S.S. Co. v. United States*, 459 F.2d at 1402–03, 198 Ct.Cl. at 329–30. This explicit reliance in *Lykes Bros.* upon the rule in excess cost cases makes it apparent that the *Lykes Bros.* comment with regard to burden of proof in the renegotiation process is not dispositive in the different context we now have.[16]

Although the Government may assert that the contractor owes it money in a renegotiation suit, we find the contractor's suit sufficiently related to a demand by it for money or property to constitute a claim against the Government for the purposes of the ASPR clause. Such a suit is, in a very real sense, an action in which the contractor is seeking either a return of money paid over to the Government as a condition of bringing suit, or the release of a bond given as security for payment of the money. Under the Renegotiation Act, a contractor's filing of a redetermination petition stays the Renegotiation Board's unilateral order only if the contractor files a bond with the court, 50 U.S.C. App. § 1218 (1970 & Supp. V 1975), which bond must be for 100% of the Board's decision less tax credits. Ct. Cl.R. 26. Absent such a stay, the Government will normally be entitled to judgment on its counterclaim for the amount determined by the Board. The contractor seeking judicial redetermination will thus be required to pay the amount ordered by the Board either before or during the pendency of its suit, or to give security in the form of a bond for that amount, and in the end its suit is for the release of the bond or the refund of the money already paid to the Government. Every successful contractor's renegotiation suit therefore involves payment at some stage of some money back to the contractor, or the freeing of money not yet fully available to the contractor. 50 U.S.C. App. § 1218 (1970 & Supp. V 1975). The procedural mechanics by which the contractor makes, one way or another, a demand on the Government for money reflect the underlying monetary nature of a renegotiation suit and of its character as a "claim against the Government." Had the renegotiation clause in this contract provided that the Government would withhold a certain percentage of payments due under all contracts with Grumman throughout the year, subject to payment upon issuance of a clearance by the Renegotiation Board, the contractor's suit to reverse the Board's unilateral order and to obtain the withheld money would plainly constitute a claim against the Government [17]—even though the Government would technically be asserting, through its unilateral order, that the contractor owed it money. In substance the normal renegotiation suit in this

---

16. Certainly *Lykes Bros.*, in holding that the Government bears the burden of proof in renegotiation, does not stand for the proposition that the party with that burden in a proceeding is the one who is making a claim against the other for all purposes. And this is as it should be for decisions allocating burdens of proof consider factors not relevant to cost allowability. Important in *Lykes Bros.*, for example, was the recognition that placing the burden upon the contractor might run askew of statutory commands that our redetermination proceedings not be treated as review of the Board's order, 50 U.S.C. App. §§ 1218, 1215(a) (1970) & Supp. V 1975. *Lykes Bros. S.S. Co. v. United States*, 459 F.2d at 1399, 198 Ct.Cl. at 323. Furthermore, considerations of fairness, probability and policy often play a significant role in deciding where to allocate burdens of proof,

Cleary, *Presuming and Pleading: An Essay on Juristic Immaturity*, 12 Stan.L.Rev. 5 (1959); these considerations involve an analysis which seems to us to be far removed from the type of analysis undertaken in determining the allowability of professional fees under a particular contract clause.

17. Because we find the nature of the suit sufficiently related to a demand for money for purposes of ASPR 15–205.31(d), we need not consider the Government's assertion that title to the money paid under the contract did not pass to the contractor because all payments were subject to divestment under either the renegotiation clause or the final audit clause, *see* note 3 *supra*.

court does not differ from that hypothetical situation.[18]

C. Having rejected plaintiff's reasons why its case (as to the renegotiation aspects) differs from the rule applicable to reimbursement of fees incurred in contract disputes, we hold that a renegotiation suit in our court falls under ASPR 15–205.31(d). Whether viewed as a challenge to a final Government position or as the end of non-adversarial negotiations, a contractor's failure to accept the Board's unilateral order and its seeking of a *de novo* redetermination in the Court of Claims is the prosecution of a claim against the Government.[19]

## III

■ There remains the question of the fees expended by Grumman in pursuing its Freedom of Information Act suit in 1970, 1971, and 1972. On that aspect of the case, the controlling factor is, in our view, that the ASPR clause relating to "prosecution of claims against the Government" covers monetary claims only (or claims for property), not demands or suits against the Government for other types of relief.

The proscription on allowance for reimbursement of expenditures for prosecuting claims against the Government goes back at least to Treasury Department Regulation T.D. 5000, 1940–2 Cum.Bull. 397, governing cost computations under the Vinson-Trammell Act which limited profits on certain war and defense items (now 10 U.S.C. §§ 2382, 7300 (1970)). At that time and for many years thereafter, the normal and usual understanding of a "claim against the Government" was a demand for money or property as of right. *See United States v. McNinch*, 356 U.S. 595, 599, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958); *United States v. Tieger*, 234 F.2d 589, 591 (3rd Cir.), *cert. denied*, 352 U.S. 941, 77 S.Ct. 262, 1 L.Ed.2d 237

18. In *Reed & Prince Mfg. Co.*, ASBCA No. 3172, 59–1 BCA ¶ 2172 (1959), the Government had asserted that the contractor owed it money for default and reprocurement costs. The contractor's demand for reimbursement for attorneys fees incurred in resisting that assertion was denied under ASPR 15–205.31(d) and another regulation using identical language. Although the contractor's successful suit similarly resulted in a declaration that it did not owe the Government the money the latter alleged was due it, the board found such suit to be a claim against the Government, stating:

"Suppose that appellant could have and actually did litigate the validity of the default action after, instead of before, it had paid the assessed default costs and reprocurement costs to the Government. Could it then urge that what it did was not the prosecution of a claim against the United States? We think not. In substance, except for bookkeeping, the two actions are the same."

Other board cases have stated the proposition more broadly. In *Drexel Dynamics Corp.*, ASBCA Nos. 9502, 9617, 9793, 10608, 67–2 BCA ¶ 6410 (1967), the Government asserted the contractor owed it money through counterclaims for unliquidated progress payments, excess costs of reprocurement and actual damages. In denying the contractor's claim for reimbursement of the attorneys fees expended in defense of these counterclaims, the Board stated, "We can see no reason for making the defense of a Government claim an exception to the general rule prohibiting payment of attorneys fees." In *Olive Hill Mfg. Co.* ASBCA No. 8365, 65–1 BCA ¶ 4863 (1965), the contractor's

reimbursement for attorneys fees in defense of the Government's assertion of entitlement to a downward equitable adjustment resulting from a change order was denied, the board saying, "We see no difference in principle between a case where the appellant is asserting a right against the Government and one when it is resisting a claim by the Government." *But cf., Hayes Int'l Corp.*, ASBCA No. 18447, 75–1 BCA ¶ 11,076 (1975).

19. Plaintiff has explicitly disavowed different treatment of legal and accounting fees for its 1965 and its 1966 renegotiable years, and does not urge that the failure of the Renegotiation Board to issue a unilateral order for 1966 requires cost recovery under the NASA Board's own theory. It appears that the Renegotiation Board's failure to issue an order was the result of plaintiff's repeated requests for extensions of time to respond to the Board's initial determination.

Also, Grumman has not argued that its professional fees were incurred in pursuit of settlement negotiations which would have made unnecessary suit in this court, and whose nature and form were more akin to expenses incurred before the Renegotiation Board. *Cf. Acme Process Equip. Co. v. United States*, 347 F.2d 538, 545–46, 171 Ct.Cl. 251, 262 (1965) (nature and form of attorneys fees expended in settlement negotiations with contracting officer subsequent to his final decision held reimbursable under contract prohibiting reimbursement for formal appeal of such decision).

(1956). This traditional understanding of "claim against the Government" is reflected in the name of our court and the limitation of our jurisdiction to "judgments for money," *United States v. Alire*, 73 U.S. (6 Wall.) 573, 575, 18 L.Ed. 947 (1868); *see United States v. King*, 395 U.S. 1, 2–3, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). Similarly with our basic jurisdictional statute, 28 U.S.C. § 1491 (1970 & Supp. V 1975), which refers and has long referred to a "claim against the United States" as meaning only a pecuniary demand. When T.D. 5000 was formulated in 1940 and even when this "prosecution of claims" provision was first incorporated into the ASPR, non-monetary suits against the Government involving contract matters (*i. e.*, for injunctive or other specific relief) were so rare as to be almost non-existent.[20] With this background, it is highly improbable that the drafters of T.D. 5000 and of this ASPR clause had anything but monetary claims in mind. We think that their purpose was simply to free the Government from having to subsidize a portion of the expense of the contractor-claimant's efforts to obtain money from the United States—and therefore that we are faithful to the drafters' objective when we limit the phrase "prosecution of claims against the Government" to pecuniary claims.

The same result emerges from the present structure of ASPR 15–205.31 itself. In that subsection, "prosecution of claims against the Government" is juxtaposed to disallowance of "defense of antitrust suits"; had "claim" been defined as broadly as is advocated by the Government—any demand on the Government for some action as a matter of right or duty or to forbear from some activity as a matter of duty—the drafters would not have had to exclude antitrust litigation explicitly. Similarly the disputed phrase appears even more particularized when compared to the exclusion of professional fees incurred in connection with "patent infringement litigation"; had

the drafters desired to exclude the expenses of "litigating" with or suing the Government, as defendant has urged, it seems plain that they knew how to use language to accomplish that result.

The NASA Board felt constrained to adopt the broader definition of "claim" in order to avoid reimbursing contractors for fees incurred in injunctive and/or private attorney general litigation, as well as for cases involving contractor resistance to Government assertions that it is owed money. We need not decide here whether other types of injunctive suit are sufficiently related to a demand by the contractor for money so as to constitute a claim within the meaning of ASPR 15–205.31(d); nor need we decide whether appeals from various kinds of contracting officer's decisions, directing the transfer to or crediting to the Government of sums of money, are so integrally related to and concerned with money claims by the contractor that they fall under this provision of ASPR even as we construe it. There may very well be such suits. But even so we are satisfied that it is incorrect to read "prosecution of claims against the Government," in the context of this ASPR regulation, as if those words blanketed all non-monetary suits and demands against the Government, no matter how far removed from a monetary demand by the contractor.

■ On this premise it is clear to us that plaintiff's expenses in pursuing its Freedom of Information Act suit, which sought to enjoin the Renegotiation Board from withholding certain evidence and to order it to produce that information, did not constitute the prosecution of a "claim" against the Government within the meaning of the ASPR regulation.[21] In contrast to the contractor's renegotiation suit, which the court has held in Part II, *supra*, concerned a direct demand for money by the contractor, this suit sought merely the disclosure of

---

20. *A fortiori*, the concept of "private attorney general" suits against the Government was unknown (or almost so).

21. Indeed, at oral argument the Government conceded that such a suit did not constitute a demand for money within the narrower, monetary, definition of "claim."

information which the contractor felt might or might not prove helpful to it in its renegotiation proceedings then or in the future. If Grumman prevailed in its FOIA action, no monetary advantage would necessarily (or even probably) flow to it. At best, the FOIA suit was based on a judgment that the information sought could well enable the company to be better prepared in proceedings before the Renegotiation Board and better able to conclude a favorable settlement with the Board on the basis of that information (prior to access to this court's discovery procedures), and that such a settlement could well be lower than it would be in the absence of this information. This is too tangential and speculative a relation to a contractor's demand in the renegotiation proceeding itself to come within the proscriptive language of the regulation, and we must therefore hold these fees reimbursable under the general allowability provision in subsection (a) of ASPR 15–205.31.[22]

### Conclusion

Plaintiff's legal and accounting expenses incurred in pursuing its 1965 renegotiation case subsequent to the Board's unilateral order, and with respect to the 1966 year after December 16, 1970, are disallowed as constituting the prosecution of claims against the Government within the exclusionary provision of ASPR 15–205.31(d), while the legal expense incurred in its litigation to compel the production of Renegotiation Board information under the Freedom of Information Act is held to be reimbursable under ASPR 15–205.31(a) since it does not constitute a "claim" within the meaning of subsection (d)'s exclusion. The parties' motions for summary judgment are granted and denied to this extent and the petition is partially dismissed in accord with this disposition. The case is remanded under Rule 149 to the NASA Board of Contract Appeals to determine the quantum of the allowed expenses and fees. Further proceedings in this court are suspended for a period not to exceed six (6) months, and plaintiff's attorney is designated to advise the court under Rule 149(f).

NICHOLS, Judge, with whom KUNZIG, Judge, joins, concurring and dissenting:

I agree with and join in Parts I and III of the court's opinion. As to Part II, respectfully, I dissent. I would not allow defendant's motion for summary judgment in any part, nor would I dismiss any part of the petition. I would remand all parts of the claim to the NASA Board for determination of quantum.

Turning first to the parts I agree with, as to Part III I would add the caveat that the Freedom of Information Act (FOIA), 5 U.S.C. § 552, *as amended*, appears to me to have been intended, among other things, to permit discovery by persons carrying on controversies with the government, that have not yet ripened into litigation. If such a person should be prosecuting a claim properly defined, at the time he made his FOIA demand, and if the demand was demonstrably ancillary to such prosecution, I would be inclined to exclude the case from our Part III analysis. That is not this case, however, since all now agree that plaintiff was not prosecuting a claim against the government when it made its FOIA demand originally, and by my analysis was not at any subsequent date. On transfer of its Petition for Redetermination here in 1971, plaintiff could have used the discovery procedures of this court, but I suppose by that time the FOIA litigation was too far along the track to be stopped.

I would apply the court's Part III analysis and interpretation of the Armed Services Procurement Regulation (ASPR) at issue, § 15.205.31(d) also to Part II. I would add that in situations where the demand for money was originally by the government, and was collected and converted somewhere along the line to a petition against the government, I would designate the claim

---

**22.** This holding makes it unnecessary to consider plaintiff's challenge to the decision of the NASA Board refusing to reopen the case.

according to its original character. Thus for example, if Mr. A is notified that the Commissioner of Internal Revenue has determined a deficiency in his income tax payments for a prior year, I would for purposes of § 15.205.31(d), and only for those purposes, treat any subsequent litigation as not prosecution of a claim against the government, no matter who initiated it, at least so long as the only procedure available required Mr. A to assume the role of petitioner, which the government maneuvered him into by statutes and regulations adopted to better its own position and worsen that of Mr. A.

My analysis starts with the proposition that § 15.205.31(d) is hopelessly and utterly ambiguous, that is, impossible to construe by mere scrutiny of its terms. As to this, the divergent interpretations given in this case in the executive branch, and the conflicting views among our own judges, are *res ipsa loquitur.* Should the Supreme Court take this case—as I believe there is need for it to do—it well may come up with a sixth interpretation all its own, as it has recently done in a tax case involving similar ambiguities, *Commissioner v. Standard Life & Accident Ins. Co.*, 433 U.S. 148, 97 S.Ct. 2523, 53 L.Ed.2d 653 (1977).

The usual recourse in such cases to legislative history, is here unavailing. Those who put forward T.D. 5000 in 1940 have gone from the scene and not left any explanation of their reasoning behind. The court opines in Part III that their purpose was to free the government from having to subsidize a portion of the contractor-claimant's efforts to obtain money from the United States. To be sure. But the language is overbroad in some respects and overnarrow in others, for any single rational purpose we can impute to these long-departed worthies. They dealt with, and here we have, a type of contract where the government pays a fixed fee for doing the job, plus allowable costs. These latter include as indirect costs, expenses necessary for running the company but not imputable directly to the performance being reimbursed. Thus, up to a point, we all agree to allow in the overhead, allocable pro rata to these contracts,' the

cost of renegotiating other contracts, made and performed in other years. It is only a certain portion of such costs that we exclude. What is the rational reason for cutting this reimbursement off when we do? Of necessity, the introduction into the ASPR of exceptions to the general rule constitute a penalty for incurring an expense of the disfavored type. The ASPR Committee may not think of it in terms of a penalty, but that is the inevitable effect of what they do. The contractor would, if he could, divert his expenses to nonexcepted items, but the "claim" language often puts this out of his power, as here construed. The government could cease to make any cost reimbursement contracts, or it could reimburse direct costs only, leaving the fee to cover all the rest. When it singles out a few perfectly legitimate indirect expenses out of many, the question of invidiousness at once arises. While such issues are not urged in this case, it would seem they would not have been frivolous, if urged, and avoidance of an invidious result should be a factor in interpretation. In the very recent case, *Ami-Chanco, Inc. v. United States*, No. 51–75, Ct.Cl., 576 F.2d 320 (decided May 17, 1978) the same itch was at work, to find something to exclude in the reimbursement of the portion of costs known as indirect costs. Plaintiff, a corporation, was a Medicare "provider," entitled to reimbursement of costs, including indirect costs. Defendant by its regulation, the Medicare Provider Reimbursement Manual, excluded, in the case of corporations "stock maintenance" costs, reports to stockholders, shareholder's meetings, proxy costs, and accounting and legal fees connected with requirements of the Securities and Exchange Commission. We held that the regulation was invalid as arbitrary and capricious, in the absence of any evidence that such costs were not ordinary and necessary for a corporation to incur.

The penalty here is assessed for exercise of a constitutional right, insofar as the statutory provisions for a due process hearing, once in the Tax Court, now in this, were essential to save the constitutionality of the

renegotiation scheme. See *Lichter v. United States*, 334 U.S. 742, 791, 68 S.Ct. 1294, 92 L.Ed.2d 1694 (1948).

The interpretation given by the court leads to a plainly overbroad result in the case of tax litigation. When the government goes into the market place to purchase goods and services, it takes on a different legal identity from the one it ordinarily occupies as a sovereign.

Thus the procurement officer is not responsible for "sovereign acts" by other branches of the government, that interfere with performance of the contract, though the same acts done by him would constitute breaches. *Cf. J. A. Jones Construction Co. v. United States*, 390 F.2d 886, 182 Ct.Cl. 615 (1968). By the same token, if not required by statute it must be an abuse for the procurement officer to frame his contract to attempt to deter the contractor from carrying on tax litigation against another and different branch of the government.

The ambiguity of the phrase "claim against the Government" was first appreciated by the bar, I think, as a result of *United States v. Bergson*, 119 F.Supp. 459 (D.D.C.1954). The United States Attorney obtained an indictment of Mr. Bergson for violating a statute prohibiting him, as an ex-government lawyer, from "prosecuting any claims against the United States involving any subject matter directly connected with which such person was so employed * * *," 18 U.S.C. § 284, as then codified. Having been Assistant Attorney General in charge of the Antitrust Division, he was retained to obtain a "clearance letter" from his former division. The decision, which is still often cited, though it was by a single District Judge, construed the statutory language substantially as the court construed the instant ASPR provision in Part III, *i. e.*, as applying solely to "claims against the United States Government for money or for property," p. 464. Accordingly, Mr. Bergson enjoyed many fruitful years as an honored member of the D.C. Bar, passing away only recently. This may have been what triggered addition of the language respecting antitrust proceedings to § 15.205.31(d). If so, it was a somewhat wooden reaction. Present conflict of interest limitations on former government attorneys are more extensively revised. The significance of the case herein is, I think, its illustration of the general failure to notice before 1954 the ambiguity of the language and its lack of conformity to any measurable notion of public policy. Few would assert that it made any real difference from that point of view whether the matter Mr. Bergson was retained on was a "claim" or something else.

The present False Claims Act, 31 U.S.C. §§ 231, 235, though now divorced from any criminal provision, and prescribing civil penalties only, likewise limits the notion of a claim against the government to one involving "a demand for money or for some transfer of public property." *United States v. McNinch*, 356 U.S. 595, 599, 78 S.Ct. 950, 952, 2 L.Ed.2d 1001 (1958), recently reaffirmed in *United States v. Bornstein*, 423 U.S. 303, n. 8, at 313, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976); see more extended discussion in *Hageny v. United States*, 570 F.2d 924, 215 Ct.Cl. —— (1978) (570 F.2d at 938, 215 Ct.Cl. at ——, Nichols, J., concurring).

Defendant herein took the somewhat unusual step of citing a Trial Division opinion which is due to come before the court for review next October, *O'Brien Gear & Machine Co. v. United States*, No. 105–72 (Trial judge's opinion filed August 16, 1977.) I should not and do not rely on its conclusions in the circumstances. It holds that plaintiff, a petitioner for renegotiation redetermination just as Grumman was, forfeited its claim for falsity in the proof under 28 U.S.C. § 2514, which so forfeits only "a claim against the United States * * *." The able trial judge holds, for reasons which he gives, that the breadth of meaning of a "claim" under that statute is broader than in the criminal statutes and really covers all cases prosecuted in the U. S. Court of Claims, whether or not they are claims for money. I think even now I can rely on that exhaustive and brilliant analy-

sis as supporting my proposition that the words "claim against the Government," or "against the United States" are utterly and hopelessly ambiguous, and must vary in meaning with every context in which they are used. This is what Trial Judge Schwartz says.

The court relies on Board authority, largely on *Reed & Prince Mfg. Co.*, ASBCA No. 3172, 59–1 BCA ¶ 2172, to the effect that the rule long has been that a proceeding before the ASBCA is a claim against the government, regardless of the origin of the dispute. Thus, in the case cited, the contractor was before the ASBCA to resist a demand by the contracting officer for liquidated damages and reprocurement costs. By analogy Grumman should have known that in disputing a claim by the Renegotiation Board for refund of alleged excessive profits, it was prosecuting a claim against the government. The semantic absurdity of the *Reed & Prince* decision leaps to the eye, as does its obvious unfairness. The rule there asserted has never come before this court for review, and citing *Reed & Prince* seems to me unpersuasive. It seems obvious the Board's construction of ASPR § 15.205.31(d) is not the same as the court's from the variance between the two respecting the FOIA expenses. The Board's definition of "claim against the Government" in the instant case is broader than the court's at least verbally, quoting favorably the words: "a demand of some matter as of right made by one person upon another, to do or to forbear to do some act or thing as a matter of duty." In view of this difference, I do not see how Board decisions can be of persuasive authority here.

The court makes no attempt in its Part II to show that the result reached is fair and reasonable; nor does it justify the difference in results in Parts II and III on fairness grounds. That kind of analysis would be gratuitous if the ASPR provision was clear, but here it is murky. When the legislators have failed to make their meaning clear, legislative history is unavailable, and valid precedent decisions cannot be found, it seems to me the time has come for the court to call into play its own notions of fairness. This is not to make ourselves moral adjudicators (*cf. United States v. Oneida Nation of New York*, Appeal No. 5–76, Ct.Cl., 576 F.2d 870, decided May 17, 1978), but because the authors of T.D. 5000 and the ASPR probably intended to be fair, if we call upon our own sense of fairness we may stumble upon what they intended.

The authors must have realized that mandatory disallowances of otherwise valid items of indirect cost would have an influence upon behavior, more or less according to the percentage of government cost type contracting on the contractor's order board. If this item was a large one, and the business all of that type, the impact of disallowance would be very severe. If the profits of the business consisted entirely of fees, big disallowances might consume the fees and produce losses for the year. I think the authors would have asked themselves if the item was necessary for survival of the business and would hesitate to disallow such necessary items unless the justification for doing so was clear. I think they would probably have distinguished between "claims" (whatever the claims were) that related to procurement and those that related to matters wholly outside procurement cognizance, and I think they would have hesitated to interfere by disallowances with the policy of contractor's management in the latter regard. The procurement officers might find it repugnant to finance disputes with themselves, but they would not feel the same way about tax disputes. If they were reluctant to finance disputes, they would not, I think, distinguish between tax disputes with the Federal Government, and tax disputes with state or local authorities, or foreign governments. Yet the involved ASPR provision, as construed by the court, treats tax disputes with the Federal Government the same as procurement disputes, while doing nothing to deter contractors from litigating tax disputes with states, or counties, or cities, or foreign governments, and charging the cost as overhead to the United States. I do not think this would have impressed the au-

thors as sensible or fair. Renegotiation is not as removed from procurement as taxation, but it is not a direct part of procurement either. Great stress is laid in the 1951 Act on the independence of the Renegotiation Board. 50 U.S.C. App. § 1217(a) is in this respect a change over the prior law under the 1948 Act, now codified as 50 U.S.C. App. § 1193, which made the Secretary of Defense responsible for renegotiation. I doubt if the authors would have been impressed that the treatment of expenses contesting ASBCA cases constituted a fair analogy to govern the treatment under § 15.205.31(d) of renegotiation expenses.

I think, too, that the authors would have thought it unfair to penalize a contractor for incurring overhead expenses it could not avoid. I think, if they had thought about it, they would have excluded from the category of claims against the government, claims originating with the government. They would not have seen anything in the switch that takes place midway where the previous target of the claim becomes a petitioner, that would justify in fairness a change in the allowability of the legal expenses at that point. The reasoning of both the board and the court as to this, appear to me to be reasoning of persons who have excluded considerations of fairness from their minds. Yet, as I have shown, the phrase "claims against the Government" has no such clear meaning as to necessitate ignoring what the authors would have intended if they had desired to be fair. I would hold, therefore, that the cost of a dispute properly allocable under the cost principles to a government contract, because of being a claim by the government, does not suddenly lose that character because the procedures the government has prescribed by statute maneuver the prior claimee (if I can coin a word) into becoming at that point a petitioner in a judicial or quasi-judicial tribunal. A true claim against the government is one which was that from the day it was born, of which we have many examples in our jurisprudence. Most claims before the ASBCA, claims for equitable adjustment for changes orders, etc., are in that category, so I do not leave § 15.205.31(d) with nothing to apply to.

I confess that my analysis has not been much aided by the efforts of both parties to put across their own theories of the nature of renegotiation, and a lot of briefing effort has been wasted so far as my feeble intellect is concerned.

It does stick in my mind as an incontrovertible fact that a unilateral order of the Renegotiation Board was and is a demand for money by the government. It may and may not be successful. There is nothing in the Renegotiation Act to require a contractor to set aside funds to pay future such demands. *Solitron Devices, Inc. v. United States*, 537 F.2d 417, 210 Ct.Cl. 352 (1976), *cert. denied*, 430 U.S. 930, 97 S.Ct. 1548, 51 L.Ed.2d 773 (1977), and cases cited therein, illustrate a wide variety of instances where the contractor has not set money aside and as a result, is unable to pay the refund the board proposes. Contractors who cannot pay usually cannot obtain a bond to stay execution of the board's order under 50 U.S.C. App. § 1218. Accordingly, the government is entitled to obtain before trial and normally does obtain in such cases a judgment in aid of execution, for which it asks in a pleading called a counterclaim. It is my impression that such judgments are often uncollectible for the reason that the alleged excessive profits, if ever really realized, have long since been distributed to stockholders, or otherwise dissipated, which the statute in no way frowns on the contractor doing. Thus the pursuit of the money to be refunded is a matter of considerable difficulty and may often fail, or succeed only in part. Whether the contractor can prosecute its petition here in no way turns on whether it has paid, or filed a bond, and I suppose we have adjudicated many cases where neither occurred. The court's assertion in Part II that the petition by the contractor always seeks to obtain repayment of money already paid to the government, or else the freeing of money not yet fully available, because secured by a bond, may be accurate in the case of established government prime contractors such as Grumman, but in the sweeping form

uttered in the opinion, disregards facts that are manifest in our published decisions. The court I imagine does not intend to limit its holding to cases as to which its generalization is true: it does not intend to hold that a renegotiation petition by *Solitron* in this court reflects a claim by the government, but one by Grumman a claim against the government. Thus the fact, if it is a fact, that Grumman is suing here in hopes of recovering a cash payment or clearing a bond, does not explain or justify the rule the court announces. In my view, the case starts with a unilateral order, a claim by the government, and nothing happens thereafter with enough regularity or consistency to justify saying that the mere filing of a petition has changed the character of the proceeding. I have no knowledge, and I doubt the court has either, whether the net aggregate effect of all our judgments, "in aid of execution" and "final," is ebb or flow, money going into the treasury, or out of it. There is therefore nothing in the nature of the cases in this court, as they really are, to justify asserting that the petitioner is always the claimant. It would be absurd to make the classification turn, in each particular case, on who expects or hopes to collect money from the other, and the analogy suggested between a renegotiation petition here under § 1218, *amended,* and one for a declaratory judgment, appears to me to be not unhelpful. It is certainly not true that Congress now does or ever did limit the jurisdiction of this court to claims against the government; the history of this court, now in preparation, will state examples to the contrary. They may not be too numerous, but enough to refute that the mere name of this court determines the nature of every lawsuit in it.

Accordingly, I concur and dissent to the extent I have indicated.