## GRUMMAN OHIO CORPORATION, Appellant,

v.

## Elizabeth Hansford DOLE, Secretary U.S. Department of Transportation, et al.

### No. 84–5543.

United States Court of Appeals, District of Columbia Circuit.

Argued May 3, 1985.

Decided Nov. 5, 1985.

As Amended Nov. 15, 1985.

---

**12.** Pub.L. No. 98–368, § 2(b)(1), 98 Stat. 490   (1984), quoted in pertinent part *supra* note 4.

Milton Eisenberg, Washington, D.C., with whom Francis J. O'Toole and Jack B. Gordon, Washington, D.C., were on the brief, for appellant Grumman Ohio Corp. John T. Boese and Richard Lehfeldt, Washington, D.C., entered appearances for appellant.

Michael J. Ryan, Asst. U.S. Atty., Washington, D.C., for appellees. Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, R. Craig Lawrence, Richard A. Stanley, Asst. U.S. Attys. and Trudy B. Levy, Asst. Chief Counsel, Urban Mass Transportation Administration, Washington, D.C., were on the brief, for federal appellees.

Richard C. Gering, Chicago, Ill., with whom David N. Webster, Washington, D.C., was on the brief, for appellee-intervenor Regional Transp. Authority.

Before WALD and STARR, Circuit Judges, and PARKER,[*] District Judge.

Opinion for the Court filed by Circuit Judge STARR.

Dissenting opinion filed by Circuit Judge WALD.

STARR, Circuit Judge.

This appeal has its roots in contract litigation pending in the United States District Court for the Northern District of Illinois between a bus manufacturer and a regional transit authority. In that action, the federal court in Chicago determined that the parties there (Grumman Ohio Corporation, the bus manufacturer, and the Regional Transportation Authority of Chicago, the purchaser of buses) were required to submit their contract dispute to a federal administrative agency, the Urban Mass Transportation Administration (UMTA), for extrajudicial resolution. When the dispute was thereafter submitted to UMTA, however, that agency refused to provide the type of arbitral forum and procedure requested by Grumman. Suit was then brought by Grumman in the United States District Court for the District of Columbia to compel UMTA to fill what Grumman viewed as the agency's arbitral role. The District Court in Washington, however, granted summary judgment in favor of UMTA, holding that UMTA was not required to resolve a common-law dispute. Grumman timely appealed, contending that UMTA was required to arbitrate the Regional Transportation Authority-Grumman dispute, with the full panoply of hearing procedures. We now affirm.

## I

UMTA is an agency within the Department of Transportation charged with re-

sponsibility under the Urban Mass Transportation Act of 1964, Pub.L. No. 88–365, 78 Stat. 302 (1964) (codified as amended at 49 U.S.C. app. § 1601–18 (1982)), for furthering the improvement and development of mass transportation. Pursuant to that charge, UMTA provides funding to local transportation agencies to assist in defraying the cost of purchasing new buses. Regional Transportation Authority ("RTA") of Chicago, Illinois is a local agency which received funding through a UMTA grant. The funds were used to purchase buses manufactured by Grumman Flxible Corporation, the predecessor of Grumman of Ohio Corporation (both referred to as "Grumman"). The relationship between UMTA and RTA was thus one of grantor and grantee respectively, while the relation between RTA and Grumman was one of purchaser and vendor respectively.

Pursuant to its statutory responsibility, UMTA had previously promulgated, after public notice and comment, see 42 Fed.Reg. 9645 (1977); 42 Fed.Reg. 13,816 (1977), a document entitled "Baseline Advanced Design Transit Coach Specifications," commonly referred to within the industry as the "White Book." The White Book contained provisions for the solicitation, offer and award of contracts, technical specifications for the buses themselves, quality assurance provisions, and warranty provisions that must be met by contractors. See White Book, reprinted in Joint Appendix at 318. Included in the White Book was the Disputes Clause at issue here. That clause, which is critical to our resolution of this case, provides as follows:

Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by an agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. The decision of the Contracting Officer shall be final

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

and conclusive unless within 30 days from the date of receipt of such copy, the Contractor mails or otherwise furnishes to UMTA a written appeal. The decision of UMTA's duly authorized representative for the determination of such appeals shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision.

This clause does not preclude consideration of law questions in connection with decisions provided for in this clause, provided that nothing in this contract shall be construed as making final the decision of any administrative official, representative, or board on a question of law. White Book at I–27–I–28, Joint Appendix at 351–52.

Use of White Book specifications was binding on UMTA grantees at all times relevant to the case at hand, *see* 46 Fed. Reg. 49,038 (1981) ("Current DOT policy is that grantees must use the 'White Book' specifications when purchasing Advanced Design Buses...."), although mandatory use of White Book specifications has since been rescinded, *see* 47 Fed.Reg. 44,457 (1982). As a UMTA grantee, RTA was hence required to include the Disputes Clause in its contract to purchase buses. RTA solicited bids for the purchase of 205 buses and entered into a contract with Grumman for their sale and delivery. The contract accordingly contained the Disputes Clause.

A dispute subsequently arose between RTA and Grumman when the buses were discovered to have stress problems in their understructures. While the problem proved correctable and Grumman made the required repairs, RTA demanded consequential damages resulting from the loss of service of the buses during the repair period. RTA brought suit in Illinois state court, whereupon Grumman removed the action to United States District Court for the Northern District of Illinois (the "Illinois litigation" or the "RTA-Grumman litigation"), *Regional Transportation Authority v. Grumman Flxible Corp.*, 532 F.Supp. 665 (N.D.Ill.1982). UMTA, it is important to note, was not a party to the Illinois litigation. In that litigation, Grumman moved to dismiss the complaint on the grounds that RTA had failed to exhaust the administrative remedy embodied in the Disputes Clause. The federal court in Chicago determined that the particular dispute was indeed within the scope of the Disputes Clause and thus dismissed the suit, without prejudice, so the prescribed administrative procedures could be exhausted.

In the wake of this decision in the Illinois litigation, RTA submitted the dispute, along with additional claims, to the RTA Contracting Officer who, in an *ex parte* proceeding, found in favor of RTA. In accordance with the Disputes Clause, Grumman notified the UMTA Administrator that it was appealing the Contracting Officer's decision. Grumman specifically requested "a copy of UMTA's procedures for processing appeals of this nature, including procedures for a formal hearing in Washington, D.C. with stenographic transcription, sworn testimony, etc., and the procedures for prehearing discovery (interrogatories, depositions, and the like)." Joint Appendix at 72. Grumman went on to state its assumption "that all proceedings in this matter are *de novo*, that the Contracting Officer's determination is to be accorded no evidentiary or other weight or consideration, and that RTA bears the burden of proving each and every element of the claims it has asserted." *Id.*

UMTA's reply set forth a detailed set of procedures by which Grumman was to submit a written statement indicating the specific portions of the Contracting Officer's

decision that were being challenged, along with Grumman's position with regard to each disputed finding and the rationale for its position. Under these procedures, UMTA would furnish a copy of that submission to RTA for comment. RTA's response would then be provided to Grumman, and both parties would be allowed to submit further comments. UMTA also designated the individual who would render decision in the matter, based entirely on the foregoing written submissions with no formal hearing or discovery. Joint Appendix at 78–79.

In this same reply, UMTA set out its reasoning for adopting the limited, paper procedure it was offering. Because of its importance to our resolution of the present appeal, we now set forth the pertinent part of UMTA's reply to Grumman:

> Since UMTA is not a direct party to the contract between a grantee and the selected manufacturer, the Disputes Clause was viewed as a mechanism whereby UMTA's assistance could be sought in resolving issues relating to the specifications, and to ensure that competition would continue to be fostered by having consistent interpretations of the contract requirements.... The Disputes Clause was intended to allow UMTA to decide, on a *de novo* basis, only those issues directly related to the interpretation and effectiveness of the White Book Specification. It was never intended to apply to issues relating to performance or damages arising out of post-delivery problems. The grant agreement between UMTA and RTA in fact specifically provides that:
>
> > "*No Government Obligations to Third Parties.* The Government shall not be subject to any obligations or liabilities by contractors of the Recipient or their subcontractors or any other person not a party to this Agreement in connection with the performance of this Project without its express, written consent and notwithstanding its concurrence in or approval of the award of any contract or subcontract or the solicitation thereof."

Thus, where the issues do not relate directly to the White Book Specifications, UMTA's review is far more limited in scope.... [I]f the appeal raises issues which are primarily local in nature, UMTA's review will be limited to determining whether RTA's decision was reasonable. If the appeal raises questions which are primarily Federal in nature, we will review them on a *de novo* basis.

*Id.* at 78A–79.

To no avail, Grumman protested these proposed procedures as inadequate. Noting Grumman's failure to address the merits of the appeal and finding that the Contracting Officer's determination was reasonable on its face, UMTA sustained the Contracting Officer's determination. Joint Appendix at 188. However, UMTA's designated decision-maker took pains to emphasize the limited nature of his decision:

> I would emphasize the limited nature of my review, for this appeal does not concern the type of dispute for which the Disputes Clause was intended. Rather, this appeal concerns matters to be resolved between the two parties in a court of competent jurisdiction under applicable State law, without UMTA involvement or reference to the Disputes Clause.

*Id.* at 78A–79.

Following UMTA's decision, both Grumman and RTA returned to court as plaintiffs in separate actions in separate jurisdictions. RTA again filed suit in the Northern District of Illinois, renewing its claims advanced in the original Illinois litigation and setting forth other claims included in its submission to the RTA Contracting Officer. Grumman moved to stay the reincarnated Illinois litigation, pending the outcome of Grumman's suit in federal district court here. That motion was granted, *see* Memorandum Opinion and Order of October 3, 1983, *reprinted in* Joint Appendix at 225, and thus the federal litigation here in Washington proceeded while the Illinois lawsuit was held in abeyance.

Grumman's action in the District of Columbia was not against RTA at all but was, rather, brought against UMTA, seeking both injunctive and declaratory relief. Specifically, Grumman sought (1) a declaratory judgment that UMTA's decision was invalid and contrary to law, and (2) a permanent injunction requiring UMTA to provide *de novo* review of the Contracting Officer's decision under the procedures Grumman found implied by the Disputes Clause. Both Grumman and UMTA filed motions for summary judgment. Holding that Grumman was not entitled to more than the procedures offered by UMTA, the District Court granted summary judgment in favor of UMTA. The court also agreed with UMTA's view that the agency's decision in the contract dispute between Grumman and RTA was due no collateral estoppel effect in the Illinois litigation and that RTA and Grumman were thus entitled to trial *de novo* in that action. *See* Memorandum of July 13, 1984, *reprinted in* Joint Appendix at 533.

The litigation has thus continued along both fronts. The RTA-Grumman suit remains in the Northern District of Illinois. That action is, of course, not within our purview. It is solely the District of Columbia litigation between Grumman and UMTA that is on appeal here. Specifically, we are called upon to review the District Court's determination that UMTA was not required to provide the forum and procedures requested by Grumman.

## II

■ Before turning to the question of UMTA's obligations under the Disputes Clause, we first address a jurisdictional issue raised by UMTA. The District Court, UMTA contends, lacked subject matter jurisdiction over this case.[1] The agency dismisses the possibility of jurisdiction under the Administrative Procedure Act or the Declaratory Judgment Act, since neither

statute constitutes, under settled law, an independent fount of federal jurisdiction. *See Califano v. Sanders,* 430 U.S. 99, 107, 97 S.Ct. 980, 985, 51 L.Ed.2d 192 (1977) ("[T]he APA does not afford an implied grant of subject-matter jurisdiction permitting subject matter review of agency action."); *Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671, 70 S.Ct. 876, 878, 94 L.Ed. 1194 (1960) (Declaratory Judgment Act not an independent source of federal jurisdiction).

UMTA also dismisses the possibility of Mandamus Act jurisdiction, 28 U.S.C. § 1361 (1982), since, in UMTA's view, nowhere is there to be found a clearly defined, peremptory duty on its part to provide Grumman the full-dress administrative procedures that it seeks. *See King v. Morton,* 520 F.2d 1140, 1146 (D.C.Cir.1975) ("Not only is a duty owed to the plaintiff necessary to give the district court jurisdiction under section 1361, but ... '[t]he writ should be used only when the duty of the officer to act is clearly established and plainly defined and the obligation to act is peremptory.'") (quoting *Hammond v. Hull,* 131 F.2d 23, 25 (D.C.Cir.1942), *cert. denied,* 318 U.S. 777, 63 S.Ct. 830, 87 L.Ed. 1145 (1943)). While this jurisdictional inquiry is unanswerable without touching on the merits, *see id.* at 1146 ("Whether the Secretary has such a duty is a jurisdictional question, which cannot be answered without inquiry into the merits...."), an examination of the merits will not, as we shall presently see, support mandamus jurisdiction.

■ UMTA next argues that no federal question or "arising under" jurisdiction, 28 U.S.C. § 1331 (1982), has been established here. UMTA's argument rests in large part on two cases from other circuits, *Hines v. Cenla Community Action Committee, Inc.,* 474 F.2d 1052 (5th Cir.1973), and *Lindy v. Lynn,* 501 F.2d 1367 (3d Cir.1974).[2] Despite these cases, UMTA's

---

1. This question was first squarely raised on this appeal. It was not briefed by the parties below, nor did the District Court address the issue. *See* UMTA's Brief at 13 n. 4.

2. In *Hines* the sole theory supporting federal question jurisdiction appears to have been that the contract under which plaintiff was employed was funded and brought about by the

argument fails, for it takes into account only statutory law, whereas this circuit, consistent with Supreme Court teaching,[3] has found section 1331 jurisdiction to lie in an action arising under federal common law. In *Trans-Bay Engineers & Builders, Inc. v. Hills,* 551 F.2d 370 (D.C.Cir.1976), the court was

> asked to determine whether the Secretary of HUD ha[d] an obligation to plaintiff Trans-Bay that [was] not rooted in a contract between them, but rather on equitable rights generated by HUD's course of activities pursuant to federal statutes, including the contracts it has sponsored, and prescribed for others, as a condition of federal aid. The claim of right [was] dependent on federal common law.

*Id.* at 377. Such a claim was held to establish section 1331 jurisdiction. Since this sort of claim is made in this case, and is in fact the only reasonable basis for the relief sought, we conclude that federal question jurisdiction indeed exists here.

Economic Opportunity Act. The court held there that the action did not arise under a federal statute, because the Economic Opportunity Act "was not an ingredient of the plaintiff's claim; for the Act provided simply the impetus for the contract upon which the suit was brought." 474 F.2d at 1056. *Hines* has some bearing here, since the Urban Mass Transportation Act also provides the impetus for the contract under which this suit was brought. While UMTA is more directly involved in the issue in this case than was the agency in *Hines,* that involvement stems from UMTA's insistence that Grumman and RTA incorporate the Disputes Clause in their contract. Nonetheless, if the issue is based on the interpretation of the contract, *Hines* might be read to suggest that the issue does not "arise under" the Constitution, laws and treaties of the United States.

In *Lindy v. Lynn, supra,* it was also claimed that section 1331 jurisdiction would lie where the action arose under a mortgage loan regulated by the Federal Housing Administration. The Third Circuit held that jurisdiction was lacking, stating: "[T]he fact that a contract is subject to federal regulation does not, in itself, demonstrate that Congress meant that all aspects of its performance or nonperformance are to be governed by federal law...." 501 F.2d at 1369. This case likewise lends support to UMTA's argument that section 1331 jurisdiction is lacking.

## III

■ We come now to the only substantive issue raised by Grumman on appeal— whether UMTA has a duty to provide the forum and procedure requested by Grumman, by virtue of UMTA's required inclusion of the Disputes Clause in the RTA-Grumman contract and Grumman's reading of that clause.[4] In making this determination, we must keep in mind the relationships between the three entities involved. As we have seen, UMTA and RTA are parties to a grant contract providing federal funds to finance RTA's purchase of buses for service to the citizenry of Chicago. Had a dispute arisen under the UMTA-RTA grant contract, UMTA would plainly be bound by the terms of that contract. However, the Disputes Clause in which Grumman would discern UMTA's duty is not, of course, to be found in the contract to which UMTA itself is a party. That clause is, rather, part of the RTA-Grumman procurement contract to which UMTA was not and is not a party. Under any contract law theory, therefore, UMTA has no obligation to Grumman.[5] Thus, UMTA's obligation to

3. *See Illinois v. Milwaukee,* 406 U.S. 91, 100, 92 S.Ct. 1385, 1391, 31 L.Ed.2d 712 (1972) ("§ 1331 jurisdiction will support claims founded upon federal common law as well as those of a statutory origin.").

4. RTA invites us also to consider whether the dispute between RTA and Grumman is, in fact, within the scope of the Disputes Clause. That question has, of course, been resolved, at least between RTA and Grumman, in the Illinois litigation. *See Regional Transportation Authority v. Grumman Flxible Corp., supra.* While there may be some question as to whether that holding would be binding in litigation between UMTA and Grumman (where RTA's status is only that of an intervenor), under the analysis that follows we need not and do not reach this question.

5. Although Grumman has not advanced the theory, it might be argued that Grumman is a third-party beneficiary of the Disputes Clause requirement found in the UMTA–RTA grant contract and thus may enforce its rights under that contract. Any such argument, however, would be destined to fail. Not only has no clear statement of the purported UMTA obligation been presented, but Grumman would be, at best, only an incidental beneficiary of the UMTA–RTA contract.

provide full-blown adjudicatory procedures to Grumman must be found in some other source.

## A

■ No statute to which we have been referred imposes any such obligation. No agency practice or procedure of UMTA for resolving common-law contract disputes has been cited to us.[6] Nor are there any formally promulgated regulations that obligate UMTA to provide Grumman and RTA a full-blown arbitral forum. The only pertinent regulations are those requiring grantees, such as RTA, to adhere to the White Book in negotiating procurement contracts with bus manufacturers. *See* 42 Fed.Reg. 13,816 (1977). Those regulations plainly require inclusion of the Disputes Clause in any procurement contract; however, upon careful reading, the regulations do not in any explicit terms impose any duty on UMTA to provide a forum for a contract dispute in which UMTA has no real interest. That is, while the regulations clearly require RTA and Grumman to submit a contract dispute to UMTA for resolution, the regulations do not explicitly require UMTA to accept the task of resolving that dispute by way of a full, adjudicatory-style arbitration. As we read the Disputes Clause, it is entirely consistent with the language of the clause for UMTA not to afford a full-blown arbitral forum for a garden-variety, non-federal dispute.

The dissent argues with some force that the White Book, including the Disputes Clause, was adopted by UMTA only after formal procedures and thus must be binding on UMTA under settled authority. The pivotal question, however, is what that clause means in the context of a federal grant contract. The dissent, not unreasonably, looks to the elaborate body of federal *procurement* law and finds there a clearly delineated set of procedures, which UMTA has now chosen not to follow. But however reasonable and logical the dissent's

position may be, the bedrock fact remains that in the RTA-Grumman dispute we are worlds apart from the federal procurement setting which gave birth to the clause which is now so hotly debated. Context is critically important in discerning meaning; it simply cannot be gainsaid that the context of federal *grant* contracts is entirely distinct, being informed by entirely different interests, than a federal procurement contract. *See, e.g.,* Federal Grant and Cooperative Agreement Act of 1977, 31 U.S.C. §§ 6301 *et seq.* (1983) ("[S]ubstantial involvement is not expected between the executive agency, and the local government, or other recipient when carrying out the activity contemplated in [a grant] agreement.") *Id.* § 6304(2). We are reluctant, in the face of adamant and sensible agency objections to being deeply mired—at great administrative cost—in disputes in which it has no conceivable interest whatever, to import elaborate procedures spawned in one setting and transplant them to alien soil. It has never been done before; indeed, there is not a hint of deviation from settled agency practice; and at bottom, it makes no sense whatever in the real world to force UMTA to preside over battles in which federal interests are minimal at best.

## B

■ We are left then with the question whether UMTA may be bound under some theory of implicit adoption of a regulation or may be equitably estopped to deny the existence of a duty. Grumman invokes cases that, in its view, argue for just that result. In *Morton v. Ruiz*, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974), for example, the Supreme Court held that an agency (there, the Bureau of Indian Affairs) may be bound not only by laws and regulations but by its own internal procedures as well. "Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly

---

6. Thus, we are not confronted with an agency's departure from an established practice or procedure, much less an unexplained departure.

more rigorous than otherwise would be required." *Id.* at 235, 94 S.Ct. at 1074. The *Morton* Court, on that basis, held that a policy of the Bureau of Indian Affairs ("BIA"), denying general welfare assistance to Indians not living directly on a reservation, was an important substantive policy which, under the procedures of the Bureau of Indian Affairs Manual, had to be published in order to be effective. Similarly in *Danks v. Fields*, 696 F.2d 572 (8th Cir.1982), the BIA was found to have failed to comply with the terms set forth in its grazing permits by attempting to initiate a fee increase after the deadline set forth in the permits. BIA's argument there, namely that the date was merely a goal, was rejected. Since "the [BIA] Area Director set th[e] deadline and made it an explicit term of each permit he issued[, the BIA was] not ... free to ignore the[ ] terms simply because [it] found them to be inconvenient." *Id.* at 577.

The difficulty in applying *Morton v. Ruiz* and *Danks v. Fields* to our case is that, here, no established procedure, written or otherwise, to provide a forum for disputes such as that between RTA and Grumman was extant at UMTA. While contracts funded under a UMTA grant were required to contain the Disputes Clause, the Disputes Clause does not, as we have seen, impose by its terms an obligation on UMTA to provide an arbitral forum; indeed, since UMTA was not a party to the RTA-Grumman procurement contract, we would be hard pressed to explain how such an obligation could arise from the terms of the contract alone. Of course, we have more in our case than the RTA-Grumman purchase contract; there is also the UMTA–RTA grant contract. Nonetheless, while the UMTA–RTA grant contract requires inclusion of the Disputes Clause, Grumman has cited no language in the grant contract clearly indicating a self-imposed duty on UMTA to provide a forum for common-law disputes.

In fact, language in both the grant contract and the White Book itself indicates that UMTA was not obligated in any fashion to third parties such as Grumman. As we have seen, *supra* pages 6–7, UMTA quoted the following provision of the UMTA–RTA grant contract in its letter explaining the procedures it intended to follow:

> "*No Government Obligations to Third Parties.* The Government shall not be subject to any obligations or liabilities by contractors of the Recipient or their subcontractors or any other person not a party to this Agreement in connection with the performance of this Project without its express, written consent and notwithstanding its concurrence in or approval of the award of any contract or subcontract or the solicitation thereof."

Joint Appendix at 79 (quoting UMTA–RTA grant contract). Furthermore, the White Book's statement requiring the Disputes Clause to be included in procurement contracts makes explicit reference to the External Operating Manual. *See* White Book at I–15, Joint Appendix at 339 ("The Contractor shall comply with the following required Urban Mass Transportation Administration clauses, which are located in Appendix 12 of the External Operating Manual."). The External Operating Manual in turn states:

> UMTA and the Federal Government are not obligated or liable to any person or organization other than the project sponsor.

> The grantee is the responsible party, without recourse to UMTA regarding the settlement and satisfaction of all contractual and administrative issues arising out of procurements entered into, in support of a grant. This includes but is not limited to: disputes, claims, protests of award, source evaluation or other matters of a contractual nature.

External Operating Manual IIIC–1, *reprinted in* Joint Appendix at 243, 247. While this language might be read in limited fashion so as to shield UMTA and the Government only from liability arising from grantees' breaches of contract or torts, the language certainly calls into question the basis of any purported obli-

gation on UMTA's part. Where the basis for the applicability of *Morton v. Ruiz* and *Dank v. Fields* (*i.e.*, that UMTA had a duty to provide the forum and procedure requested by Grumman) is so weakly established, the quoted language flatly eschewing any obligation to third parties such as Grumman takes on greater importance.[7]

## C

■ This, however, does not end our inquiry. Underlying portions of Grumman's brief appears, understandably, to be a plea for equitable estoppel. *See* Appellant's Brief at 27–29. While "[i]t is clear that '[t]he fundamental principle of equitable estoppel applies to government agencies, as well as private parties,'" *General Accounting Office v. General Accounting Office Personnel Appeals Board*, 698 F.2d 516, 526 n. 57 (D.C.Cir.1983) (quoting *Investors Research Corp. v. Securities & Exchange Comm'n*, 628 F.2d 168, 174 n. 34 (D.C.Cir.), *cert. denied*, 449 U.S. 919, 101 S.Ct. 317, 66 L.Ed.2d 146 (1980)), "traditionally there has been a reluctance to apply the doctrine against the government," *id.* (citations omitted).

The Supreme Court cases considering the application of that doctrine leave the specific standards for its application not precisely clear. In its most recent teaching on the subject, the Court declined to embrace the proposition "that estoppel may not in any circumstances run against the Government" but found that the party in the case before it had in any event failed to demonstrate "the traditional elements of an estoppel." *Heckler v. Community Health Services*, 467 U.S. 51, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). In *Schweiker v. Hansen*, 450 U.S. 785, 101 S.Ct. 1468, 67

L.Ed.2d 685 (1981), the Court refused to hold the Government estopped from denying Social Security benefits to an individual who, by virtue of erroneous statements by a field representative, had failed to apply for benefits. The Court pointed to a lack of affirmative misconduct by Government authorities, but also relied on its unwillingness to burden the public fisc, as well as its conclusion that the claimant could have remedied the effects of the erroneous advice at any time. The decision did not make clear whether anything short of affirmative misconduct would justify application of the equitable-estoppel doctrine. *See General Accounting Office, supra,* 698 F.2d at 526 n. 57. An indication that affirmative misconduct is in fact required might be found in *Immigration & Naturalization Service v. Miranda*, 459 U.S. 14, 103 S.Ct. 281, 71 L.Ed.2d 12 (1982), where the application of equitable estoppel was disallowed at least partially on the basis that no affirmative misconduct had occurred; again, however, the conclusion to be drawn in this respect is not crystal clear.

In any event, this circuit has clearly concluded that "[e]stoppel generally requires that government agents engage—by commission or omission—in conduct that can be characterized as misrepresentation or concealment, or, at least, behave in ways that have or will cause an egregiously unfair result." *General Accounting Office, supra,* 698 F.2d at 526 (footnote omitted). The situation before us meets neither of these two standards.[8]

In the first place, there appears to have been no actual misrepresentation or concealment here. We have already seen that no definitive statement was made by

---

7. Even were we to have found the implicit adoption of a regulation requiring UMTA to hear certain disputes, UMTA would have been entitled to great deference in interpreting that regulation. *See United States v. Larionoff*, 431 U.S. 864, 872–73, 97 S.Ct. 2150, 2155–56, 53 L.Ed.2d 48 (1977); *Udall v. Tallman*, 380 U.S. 1, 17–18, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 1 (1965); *Bowles v. Seminole Rock Co.*, 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). UMTA's professed non-interest in state common law issues, as opposed to its strong interest in

the consistent interpretation of its own technical specifications, would provide a reasonable basis for its interpretation of the regulation as not including the RTA-Grumman dispute.

8. Since we conclude that UMTA's conduct does not meet the minimal level required under *General Accounting Office*, we need not determine whether the Supreme Court cases require the higher-level finding of affirmative misconduct.

UMTA as to the right of contractors such as Grumman to the forum and procedure which Grumman requested. What we find, rather, is simply the rather odd judgment of UMTA in selecting a Disputes Clause more suitable for *federal* procurement contracts for inclusion in the procurement contracts of its *non-federal* grantees.[9] The dissent, however, observes that UMTA affirmatively assured concerned bus manufacturers in 1977 that the Disputes Clause provided ample protection to them and was "based on procedures for handling disputes in Federal Government contracts." Joint Appendix at 356. This one-sentence, shorthand response set forth in a twelve-page UMTA statement of rationale is clearly helpful to Grumman's position, but we are unpersuaded that this abbreviated statement provides a sufficient foundation upon which to force UMTA to build an elaborate dispute-resolution center to which bus manufacturers could repair to avoid local courthouses and juries (or extrajudicial forums, which Grumman may well be able to seek under the RTA-Grumman contract in the Illinois litigation). Our reluctance is buttressed by the fact that UMTA has never sat in judgment on such "local" disputes; moreover, UMTA's interpretation of the Disputes Clause is entirely sensible in the context of federal grants.

Second, the only "egregiously unfair result" to which Grumman can point is that it relied on UMTA's availability as an arbitral forum and was led not to bargain with RTA for an alternative arbitration clause. Thus, Grumman fears that it must face a court trial in Chicago on .RTA's claims. That point is entirely understandable but, upon analysis, not well taken. If Grumman believes that it can show, as it well may, that the parties to the RTA-Grumman contract intended that all disputes go to arbitration, then that position can be advanced in federal district court in Chicago. The RTA-Grumman dispute is, of course, the subject of the Illinois litigation, not the litigation here in Washington, and this argument could therefore be made—with considerable force it seems to us—in that forum.[10]

9. While inartfully worded for the specific purposes UMTA was seeking to achieve, the Disputes Clause did, of course, provide UMTA some benefit. The clause's operation here, for example, brought the specifics of a significant claim by a large grantee to UMTA's attention and provided the agency with the option to hear and resolve the claim.

10. Given the substantial divergence in views expressed by the federal district courts here and in Illinois, we discuss briefly the interplay of those two decisions in order to cut through what has become a confusing litigation thicket. As to the decision of the U.S. District Court for the District of Columbia, *reprinted in* Joint Appendix at 533, the conclusion reached is correct, but the analysis, we believe, starts off in the wrong direction. The court treats the question before it as one of contract interpretation and accordingly looks to the intent of the parties. The court notes that the language of the Disputes Clause is that of a government procurement contract. In such a contract, given the holding of the District Court for the Northern District of Illinois that the dispute is within the scope of the Disputes Clause, UMTA would have a duty to arbitrate. The D.C. court opinion concludes, however, that to carry procurement contract procedures over to grant contracts would produce anomalous results, and that the procedures offered by UMTA were reasonable given UMTA's limited interest in grantee-vendor contract disputes.

The D.C. court opinion does not articulate what seems to us to be an important distinction. If the dispute actually arose in the context of a grant contract (that is, the ·contract between UMTA and RTA), UMTA would, it seems, be bound by the interpretation given the clause in a procurement contract. Here, however, the clause does not appear in a grant contract, but only in a contract funded through a grant. The key distinction is between procurement contracts, in which the Government is a party, and contracts funded under grants, in which the Government is not a party at all. Since UMTA is not a party to the contract in which the Disputes Clause is included, the exercise for the court here in Washington was not, upon analysis, one of contract interpretation but rather one of searching for a duty *vel non* outside the contract. While the D.C. court opinion does not set out on such a search, we nonetheless agree with that court's ultimate conclusion, since such a duty, for the reasons we have set forth in the text, is not to be found.

The Illinois court's January 18, 1985 Memorandum Opinion characterizes the D.C. court's approach as "puzzling." The Illinois court notes the D.C. court determination that the issue is one of contract interpretation and finds confusing the D.C. court's resort to the intent of the reluctant arbitrator rather than to the intent of

It is not for us to order the selection of an alternative arbitrator in the RTA-Grumman dispute, now that UMTA has declined to provide a full dress extrajudicial forum for resolution of RTA's dispute with Grumman. Our sole consideration, rather, is the determination of whether UMTA may be forced to fill that role. On that question, we conclude that UMTA, while having pursued a rather curious course of action in requiring inclusion of this particular Disputes Clause in a grantee's procurement contract,[11] is under no duty to provide an arbitral forum nor to provide any particular set of procedures for resolution of a contract to which UMTA is not a party.[12] For that reason, the judgment of the United States District Court for the District of Columbia is

*Affirmed.*

WALD, Circuit Judge, dissenting.

The majority holds that this mundane contract dispute between a municipal agency in Chicago, Illinois, and a bus manufacturer over the bus manufacturer's delivery in Chicago of allegedly defective buses should be resolved before a court in Chicago, not before a federal agency in Washington.[1] I agree with the agency's view

---

the parties to the contract. While this point does have force, for the reasons we have just stated, we also believe that the Illinois court's opinion loses sight of the difference between the proceedings in the two courts.

The Illinois court is, of course, hearing a contract dispute between the parties to the contract. In that case, the intent of the parties obviously controls. The Illinois court has already found that the parties' intent was to submit disputes within the scope of the Disputes Clause to UMTA for decision and, on that basis, found a failure to exhaust administrative remedies. The scene then shifted to the D.C. court where the court here was not, in reality, interpreting a contract. It should have been, instead, trying to determine the existence *vel non* of a duty on the part of a non-party (UMTA) to arbitrate the dispute. The intent of the parties to the contract has little relevance to that question, unless equitable grounds may arise from such an intent. In a word, in the case before the D.C. court, the intent of UMTA has more, though still not controlling, relevance.

In the end, the D.C. court's opinion does not in any way contradict the earlier opinion of the Illinois court. Under the law of that case, the parties did intend to submit this very dispute to UMTA, and they had thus failed to exhaust administrative remedies. In the wake of that ruling in Chicago the parties submitted the dispute, but UMTA refused to grant the full procedures called for by the Disputes Clause in a procurement setting. The parties have now exhausted their administrative remedies, and the dispute is appropriately back before the Illinois court.

11. To achieve its purposes, while giving clearer notice to the parties, UMTA plainly should have modified the wording of the standard-form Disputes Clause so as to incorporate expressly the agency's right of refusal to resolve with finality a contract dispute which did not involve "the interpretation and effectiveness of the White Book Specification." Joint Appendix at 78A–79A.

12. Clearly, the less formal procedure afforded by UMTA would provide grounds for contesting any claim that the determination is final and conclusive. But, as we have seen, UMTA did not claim any such finality or conclusiveness for its decision, a position with which the United States District Court for the District of Columbia agreed. *See* Memorandum of July 13, 1984, *reprinted in* Joint Appendix at 533. This position of nonfinality seems also to have been adopted by the district court in the Illinois litigation. *See* Memorandum Opinion and Order of January 18, 1985 at 15.

1. I agree that this case arises under federal law and that we therefore have jurisdiction under 28 U.S.C. § 1331, although for slightly different reasons than those stated by the majority. The majority suggests that federal common law governs, primarily because the basic claim of the plaintiff, Grumman Ohio Corporation (Grumman), turns on "'equitable rights generated by [the agency's] course of activities pursuant to federal statutes, including the contracts it has sponsored, and prescribed for others, as a condition of federal aid.'" Maj.Op. at 344 (quoting *Trans-Bay Engineers & Builders, Inc. v. Hills,* 551 F.2d 370, 377 (D.C.Cir.1976)). But in this case, unlike *Trans-Bay,* a putative federal regulation rather than equitable rights created by a federal agency is directly at stake. Grumman's basic claim is that the Disputes Clause is a federal regulation; that under the Disputes Clause the agency obligated itself to provide Grumman with a full adjudicatory hearing on its complaint against the Chicago Rapid Transit Authority; and that Grumman is "aggrieved" within the meaning of the Administrative Procedure Act by reason of the agency's failure to follow its own regulation. As UMTA's cause of action derives from the Administrative Procedure Act and the substantive rule of decision is provided

that this result is sensible policy. But good policy is not always good law. Reluctantly, I conclude that the "White Book" is a regulation binding on the agency until revoked, and that the only reasonable interpretation of the White Book requires the agency to hold a hearing and decide this dispute. I therefore respectfully dissent.

## I.

The Urban Mass Transportation Act was passed in part "to provide assistance to State and local governments and their instrumentalities in financing [mass transportation] systems, to be operated by public or private mass transportation companies as determined by local needs." 49 U.S.C. app. § 1601(b)(3). To carry out that broad purpose, Congress authorized the Secretary of Transportation to make grants "on such terms and conditions as the Secretary may prescribe" to local governments for the development of mass transportation facilities, 49 U.S.C. app. § 1602(a)(1), and to approve or disapprove the acquisition of mass transit equipment by local governments with federal funds "on such terms and conditions as he may prescribe." 49 U.S.C. app. § 1604(d)(1). The Secretary may also "issue such regulations as he deems necessary to administer" the urban mass transit grant program established by the statute. 49 U.S.C. app. § 1604(d)(2).

In 1977, the Urban Mass Transit Authority (UMTA), acting on behalf of the Secretary of Transportation, proposed for notice and comment a regulation directing UMTA to develop uniform technical specifications and certain other contractual provisions to be used by local governments in purchasing advanced design buses (ADBs) with UMTA grant funds. As ultimately adopted, the regulation required recipients to include terms and specifications to be developed by UMTA in federally subsidized bus purchases.

Acting under the authority conferred by this regulation, UMTA developed the "White Book," a list of contractual provisions, technical specifications, quality control provisions, and warranties that were mandatory in UMTA-subsidized purchases of ADBs. Among the provisions that the White Book required local governments to include in subsidized bus purchase agreements was a clause titled "Disputes." That clause read:

### 2.17   DISPUTES

Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. The decision of the Contracting Officer shall be final and conclusive unless within 30 days from the date of receipt of such copy, the Contractor mails or otherwise furnishes to UMTA a written appeal. The decision of UMTA's duly authorized representative for the determination of such appeals shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision.

This clause does not preclude consideration of law questions in connection with decisions provided for in this clause, provided that nothing in this contract shall be construed as making final the decision of any administrative official, representative, or board on a question of law. Baseline Advanced Design Transit Coach Specifications at I–27 to I–28, J.A. at 351–52.

by a putative federal regulation, Grumman's ac-     tion plainly arises under federal law.

In *Batterton v. Marshall*, 648 F.2d 694 (D.C.Cir.1980), this court explained the general distinction between agency rules and non-binding agency action:

"[L]egislative" or "substantive" rules can be issued only if Congress has delegated to the agency the power to promulgate binding regulations in the relevant area. Legislative rules thus implement congressional intent; they effectuate statutory purposes. In so doing, they grant rights, impose obligations, or produce other significant effects on private interests. They also narrowly constrict the discretion of agency officials by largely determining the issue addressed. Finally, legislative rules have substantive legal effect....

Non-binding action, in contrast, merely expresses an agency's interpretation, policy, or internal practice or procedure. Such actions or statements are not determinative of issues or rights addressed. They express the agency's intended course of action, its tentative view of the meaning of a particular statutory term, or internal house-keeping measures organizing agency activities. They do not, however, foreclose alternate courses of action or conclusively affect rights of private parties. Although an agency empowered to enact legislative rules may choose to issue non-legislative statements, an agency without legislative rulemaking authority may issue only non-binding statements. Unlike legislative rules, non-binding agency statements carry no more weight on judicial review than their inherent persuasiveness commands.

*Id.* at 701–02 (footnotes omitted); *see also Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed.2d 1563 (1942). Under this standard, it is plain that the White Book, as well as the UMTA regulation requiring grant recipients to use White Book specifications in federally subsidized ADB purchases, qualifies as a binding regulation. The Urban Mass Transportation Act clearly delegates legislative rulemaking authority to the Secretary of Transportation, which he explicitly invoked both in promulgating the regulation requiring the use of certain uniform specifications and terms in ADB purchases, and in setting out those specifications and terms in the White Book.[2] The White Book established mandatory and binding conditions on grant recipients, which were plainly intended to have the force of law. UMTA must therefore obey its terms.

## II.

I turn next to the crux of this case. UMTA has decided that under the Disputes Clause, it need not determine the merits of disputes between grant recipients and their contractors *de novo* unless, in the agency's view, some interest of the federal government is at stake. The majority devotes only a single, conclusory sentence to this central question: it declares that "[a]s we read the Disputes Clause, it is entirely consistent with the language of the clause for UMTA not to afford a full-blown arbitral forum for a garden-variety, non-federal dispute." Maj.Op. at 345. However, the Disputes Clause has a much longer history in the law than the White Book. For many years before the White Book was promulgated, the clause had been used in con-

---

**2.** The White Book, unlike the regulation requiring the use of White Book specifications in UMTA-subsidized ADB purchases, was not formally proposed for notice and comment by publication in the *Federal Register*. The White Book was, however, developed only after informal consultations with bus manufacturers and others; and because regulations concerning government grants and contracts are not subject to the notice and comment provisions of the Administrative Procedure Act, *see* 5 U.S.C. § 553(a)(2), the agency's decision not to conduct

a full-scale notice and comment proceeding in promulgating the White Book does not suggest that the White Book is not a regulation.

The majority never quite decides whether the White Book is a regulation, although its statement that no "formally promulgated regulations" require UMTA to provide an arbitral forum apparently gives some weight to UMTA's decision not to propose the White Book for notice and comment. For the reasons stated above, that fact is not entitled to weight here.

**352**

tracts between federal agencies and their contractors. In that context, the clause was universally understood to require that agencies give independent consideration to a contractor's claims. I believe that the language of the clause, particularly when read against the acknowledged meaning of the clause in federal procurement contracts, compels us to hold UMTA's interpretation of the Disputes Clause unreasonable and therefore unlawful.

**A**

When the White Book was first proposed, UMTA tentatively settled on use of the standard Disputes Clause in contracts between federal agencies and their contractors.[3] Some bus manufacturers then commented that the Disputes Clause gave them too little protection; in particular, the manufacturers objected that reviewing courts should be able to set aside UMTA determinations if " 'erroneous,' " rather than only if " 'so grossly erroneous as necessarily to imply bad faith.' " *See* Statement of Rationale for UMTA Response to Manufacturer Comments and Requests on April 4, 1977 Issue of ADB Specifications at 4, J.A. at 356. UMTA replied that the Disputes Clause *"is based on procedures for handling disputes in Federal Government contracts,* and does provide to the Contractor the protection being sought." *Id.* (emphasis added). UMTA's reply was plainly a reference to the substantial body of law interpreting the Disputes Clause in federal procurement contracts; under those cases, the courts have given considerable protection to government contractors by, for example, steadfastly enforcing the separate provision in the clause that reserves questions of law to determination by the court. UMTA reassured the bus manufacturers by noting, in effect, that established procedures for the enforcement of the Disputes Clause in government procurement contracts would carry over to enforcement of the clause in contracts be-

tween federal grantees and their contractors.

Thus, UMTA interpreted the Disputes Clause at the time it was issued to incorporate the extensive law governing the meaning of the very same words in government procurement contracts. That interpretation is entitled to considerable weight here. Even more important, however, that interpretation reinforces the clear implications of UMTA's deliberate decision to require, word-for-word, the use in ADB contracts of a clause with so settled a history of judicial interpretation. The text of the clause is virtually a term of art writ large in government procurement law; every phrase has been carefully parsed, and scores of judicial and administrative decisions have been issued explaining exactly what these phrases mean. In these circumstances, the message in UMTA's decision to require use of the very same text in ADB purchase contracts is absolutely clear: the law governing the Disputes Clause in the White Book is the firmly established law interpreting the clause in procurement contracts. The majority comments that UMTA's interpretation of the Disputes Clause is entitled to great deference. *See* Maj.Op. at 347 n. 7. But that claim is a little like the argument that because the phrase "joint tenancy" has no plain meaning on its face, an agency should be entitled to interpret it, long after it was employed in a regulation, as really meaning "tenancy in common." The fact is that the basic meaning of the Disputes Clause was settled in the law long before UMTA promulgated the White Book. By adopting this clause, UMTA must be understood to have adopted the meaning its words had long been given in the law.

Under that accepted meaning, there is no question but that UMTA was required to hold a hearing before deciding the dispute between the Chicago Rapid Transit Authority (CRTA) and Grumman Ohio Corpora-

**3.** UMTA considered alternative versions of the Disputes Clause in connection with a separate rulemaking dealing with specifications for a different line of buses. *See* Transbus Procurement Requirements at I–20 (1976), J.A. at 269. However, the rationale quoted in the text was the one UMTA supplied for including the Disputes Clause in the White Book.

tion. In 1969, for example, the Court of Claims stated that:

> The "Disputes" article under which these Board decisions were rendered, does not countenance a rubber-stamping of the contracting officer's decision. Under the "Disputes" article, his decision enjoys no presumptive validity whatever. It is vacated by the appeal to the [agency]. The latter then owes the contractor a de novo hearing and a de novo decision based on the applicable law, the contract terms, and a preponderance of the evidence. The Board cannot abdicate that responsibility by applying Wunderlich Act-type tests to the contracting officer's decision. Those tests are reserved for a court engaged in any subsequent judicial review of a Board decision.

*Southwest Welding & Mfg. Co. v. United States,* 413 F.2d 1167, 1184–85 (Ct.Cl.1969) (footnote omitted).[4] There are many cases in accord, including a substantial number decided before UMTA issued the White Book. *See, e.g., Schnip Building Co. v. United States,* 645 F.2d 950, 960 (Ct.Cl. 1981); *Lykes Bros. S.S. Co. v. United States,* 459 F.2d 1393, 1403 (Ct.Cl.1972). These cases cannot be meaningfully distinguished on the ground that they concern agreements between federal agencies and their contractors, rather than an agreement between the recipient of a federal grant and its contractor. The essential point is that UMTA deliberately took language with an unquestioned meaning in procurement contracts, transposed precisely that language into grant recipient contracts, and reassured worried bus manufacturers at the time of promulgation that the procedures accompanying use of the clause in procurement contracts would govern the relationship between grant recipients and

bus manufacturers. UMTA cannot now be allowed to say that in making these explicit and implicit representations, it was only fooling.

**B**

In my judgment, the text of the Disputes Clause further weakens UMTA's position. The clause first requires that "any dispute concerning a question of fact arising under this contract which is not disposed of by agreement" be submitted to the contracting officer, who is always employed by the federal procurement agency or grant recipient and is therefore an interested party. The contractor—here, Grumman—may then appeal the decision of the Contracting Officer to UMTA, which must afford the contractor "an opportunity to be heard and to offer evidence." UMTA's decision, in turn, may be reviewed in court only to determine whether it was "fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence" or incorrectly decided a "question of law."

UMTA's "interpretation" of the clause creates a completely different scheme. Under it, UMTA first separates issues raised by a contractor's appeal into those "primarily local in nature" and those "primarily Federal in nature." For local issues, UMTA will determine only whether the contracting officer's decision was "reasonable"; for federal issues, UMTA will reconsider the decision *de novo.*[5] Letter from Arthur E. Teele, Jr., to William K. Sweeney at 3 (Mar. 30, 1983), J.A. at 79. UMTA's new scheme therefore denies the contractor an administrative decision by an unbiased tribunal on local issues. The text of the clause allows only very narrow judi-

---

**4.** The Wunderlich Act, ch. 199, 68 Stat. 81 (1954) (codified at 41 U.S.C. §§ 321–322), provides for judicial review of certain administrative decisions in contracts disputes to which the United States is a party to determine only if the decision "is fradulent [sic] or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence," *id.* § 1, or if the decision is erroneous on "a question of law," *id.* § 2. The Disputes Clause provides that these same standards are to

govern judicial review of administrative decisions under the clause. *See supra* at p. 340.

**5.** UMTA argues strenuously that the Disputes Clause should not be enforced against it because it is not equipped to provide the full adjudicatory hearing Grumman has requested, but UMTA's willingness to decide federal issues *de novo* casts considerable doubt on its argument.

cial review of all UMTA decisions on grievances presented by a contractor. But if this limitation on judicial review were enforced with respect to UMTA decisions on local issues, the contractor would be entirely deprived of any unbiased *de novo* consideration of its claims. *Cf. Grumman Aerospace Corp. v. United States*, 579 F.2d 586, 592 (Ct.Cl.1978) (*de novo* proceeding before board of contract appeals or court "is the first in which the contractor is afforded due process"). Even UMTA does not urge this extreme result; instead, UMTA apparently suggests that courts, despite the express language of the Disputes Clause, should evaluate *de novo* UMTA decisions on matters UMTA found to be local.

Thus, UMTA first invented two completely different levels of review—a distinction that has no basis at all in the language of the clause. UMTA then decided that for local issues, the contractor would receive only deferential appellate review of an *ex parte* decision by a biased party before the tribunal with an obligation to afford the contractor "an opportunity to be heard and to offer evidence"; and that the contractor would later receive *de novo* review of its grievance before a judicial tribunal supposedly limited to deferential appellate review of the agency decision.[6] I cannot accept this unrestrained rewriting of the Disputes Clause under the guise of interpretation.

### III.

There is no doubt that an agency is bound by its legislative regulations until they are altered or revoked. In this case, UMTA has in fact altered its regulations: recipients of UMTA grants for the purchase of ADBs are no longer required to use White Book specifications, although

they may do so if they wish. *See* 47 Fed. Reg. 44,457 (1982); 46 Fed.Reg. 49,038 (1981). In abolishing mandatory use of the White Book, UMTA did not state whether it intended to affect the future resolution of disputes under contracts signed when the use of White Book specifications was mandatory for the recipients of UMTA grants. In any event, UMTA did not decide this dispute based on any theory that it has changed its regulations. Its claim from the start has been that the White Book "was never intended to apply to issues relating to performance or damages arising out of post-delivery problems." Letter from Arthur E. Teele, Jr., to William K. Sweeney at 2 (Mar. 30, 1983), J.A. at 78A. Because we may uphold the agency's decisions only on the rationale it set forth, I consider only whether the agency's interpretation of its regulation is reasonable. I express no view on any authority the agency may have to alter its regulation as applied to disputes arising under contracts signed when the use of the White Book in UMTA-subsidized purchases of ADBs was mandatory.

### Conclusion

I close where I began, with an expression of sympathy for UMTA's efforts to prevent local contract fights between municipalities and private corporations from becoming enmeshed in federal administrative machinery far from the place of the dispute. But when UMTA promulgated the White Book, it failed to recognize the reasons supporting local resolution of local controversies in the text of the Disputes Clause. UMTA's decision was based only on an interpretation of the unaltered text of the Disputes Clause, and in my view that interpretation

---

**6.** The majority finds support for UMTA's position in a separate provision of the contract between UMTA and CRTA, titled *"No Government Obligations to Third Parties."* *See* Maj.Op. at 346. This paragraph does not appear in the White Book, although a somewhat similar statement appears in a document called the "External Operating Manual," which is cited in the White Book. *See id.* at 346. But as the majority acknowledges, these statements are simply general denials that the government has any

obligations or liabilities to those who contract with the recipients of federal grants. *See id.* at 346. They are most naturally read to mean that the federal government has no derivative liability for the contractual and legal duties of the grant recipient. In my judgment, these highly general statements cannot reasonably be read to modify the federal government's independently assumed and specifically described responsibilities under the Disputes Clause.

was plainly unreasonable. I would reverse the judgment of the district court, and remand the case to the district court with instructions to set aside the decision of the agency and to direct the agency to conduct further proceedings consistent with this opinion.

